DAVID A. THOMAS (Bar No. 215367)
David.Thomas@BlankRome.com
NICOLE B. METRAL (Bar No. 286606)
Nicole.Metral@BlankRome.com
ERICA R. GRAVES (Bar No. 301785)
Erica.Graves@BlankRome.com
ALLEN HO (Bar No. 318187)
Allen.Ho@BlankRome.com
BLANK ROME LLP
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Telephone:  424.239.3400
Facsimile:   424.239.3434

Attorneys for Plaintiff and Counter-Defendant
The Santa Barbara Smokehouse, Inc.
and Plaintiff DHBrands Limited

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE SANTA BARBARA SMOKEHOUSE, INC., a California corporation, and DHBRANDS LIMITED, a Cyprus limited liability company,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>AQUACHILE, INC., a Florida corporation, AGROSUPER S.A., a Chile corporation, and EMPRESAS AQUACHILE S.A., a Chile corporation,<br><br>　　　　　　　　　Defendants. | Case No. 2:19-cv-10733-RSWL-(JEMx)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT**<br><br>Date:　　　　February 22, 2022<br>Time:　　　　10:00 a.m.<br>Courtroom: To Be Noticed<br>Judge:　　　Hon. Ronald S.W. Lew<br><br>Fact Discovery Cutoff: Dec. 10, 2021<br>Pretrial Conference:　Mar. 22, 2022<br>Trial:　　　　　　　Apr. 12, 2022 |

1  AQUACHILE, INC., a Florida corporation,

2

3                                    Counter-Plaintiff,

4         vs.

5  THE SANTA BARBARA SMOKEHOUSE,

6  INC., a California corporation,

7                                    Counter-Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

                                                                         **Page**

I.    INTRODUCTION ..................................................................... 1

II.   COUNTER-STATEMENT OF FACTS ................................... 2

      A.   The Smokehouse's Prior Lawsuit Against Agrosuper's Subsidiary.......... 2

      B.   The Smokehouse's July 3, 2017 Supply Agreement with AquaChile.......................................................................... 3

      C.   Agrosuper Acquires Empresas AquaChile and Its Subsidiaries, and AquaChile Twice Reassures the Smokehouse of No Adverse Impacts ........................................................... 4

      D.   ████████████████████████████████████████
           ████████████████ ............................................... 4

      E.   Defendants Cut Back Supply While Misleading the Smokehouse............ 5

      F.   The Smokehouse and Defendants Resolve Their Disagreements in June 2019, and Defendants Ostensibly Reaffirm Continued Supply ........ 5

      G.   ████████████████████████████████████████
           ████████████ ............... 8

      H.   Defendants Repeatedly Mislead Plaintiffs to Believe Supply Will Continue While They Seek to Gradually Exit the Relationship ............. 10

      I.   Defendants Cut Off All Supply, Causing Plaintiffs' Deal to Collapse .................................................................... 12

III.  DEFENDANTS' MOTION SHOULD BE DENIED IN ITS ENTIRETY ....... 13

      A.   Ample Evidence Supports the Existence and Validity of the July 3, 2017 Agreement and AquaChile's Breach of That Agreement.............. 13

           1.   The July 3, 2017 Agreement Was an Enforceable Contract ........ 13

           2.   The Agreement Was Not Terminable at Will, at Least in 2019........................................................................ 14

      B.   Ample Evidence Supports Plaintiffs' IPEA Claims ............................. 15

           1.   An Economic Relationship Between SBS and Labeyrie with a Probability of a Future Economic Benefit Existed...................... 15

           2.   Defendants Committed Wrongful Acts ......................................... 18

           3.   Defendants Had Knowledge of the Economic Relationship ........ 18

           4.   Causation Is Readily Established.................................................. 19

i

     5.     Damages Are Not Speculative.........................................................20

C.    Ample Evidence Supports Plaintiffs' Fraudulent Concealment
Claim .......................................................................................................21

D.    Ample Evidence Establishes Agrosuper's Liability ................................23

E.    Ample Evidence Supports Plaintiffs' Contract Interference Claims.......24

F.    Ample Evidence Supports Plaintiffs' Breach of Contract Claim ............24

G.    Ample Evidence Supports Plaintiffs' Promissory Estoppel Claim .........25

H.    AquaChile's Fraud Bars Its Counterclaims ............................................25

IV.    CONCLUSION .................................................................................................25

**PLS.' MEM. OF P.'S AND A.'S IN OPP. TO DEFS.' MOT. FOR SUMM. J.**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Grape Growers v. Bronco Wine Co.*,
203 Cal.App.3d 432 (1998) ................................................................ 14

*Beckwith v. Dahl*,
205 Cal.App.4th 1039 (2012) ............................................................ 22

*Bockrath v. Aldrich Chem. Co.*,
21 Cal.4th 71 (1999) ......................................................................... 19

*Bowmer v. H.C. Louis, Inc.*,
243 Cal.App.2d 501 (1966) .............................................................. 25

*Cline v. Reetz-Laiolo*,
329 F.Supp.3d 1000 (N.D. Cal. 2018) ............................................. 20

*Code Rebel, LLC v. Aqua Connect, Inc.*,
2013 WL 5405706 (C.D. Cal. Sept. 24, 2013) ................................. 16

*Consolidated Theaters, Inc. v. Theatrical Stage Employees Union*,
69 Cal.2d 713 (1968) ........................................................................ 15

*Fields v. Mobile Messengers Am., Inc.*,
2013 WL 6774076 (N.D. Cal. Dec. 23, 2013) .................................. 15

*Fifty-Six Hope Rd. v. Jammin Java Corp.*,
2017 WL 2457487 (C.D. Cal. Jan. 25, 2017) ........................ 17, 18, 21

*Founding Members of Newport Beach Country Club v. Newport Beach
Country Club, Inc.*,
109 Cal.App.4th 944 (2003) ............................................................. 15

*Franklin v. Dynamic Details, Inc.*,
116 Cal.App.4th 375 (2004) ............................................................. 19

*Gonzales v. Lloyds TSB Bank, PLC*,
532 F.Supp.2d 1200 (C.D. Cal. 2006) .............................................. 24

*Hynix Semiconductor Inc. v. Rambus Inc.*,
2007 WL 4209399 (N.D. Cal. Nov. 26, 2007) .................................. 23

*Impeva Labs, Inc. v. Sys. Plan. Corp.*,
   2012 WL 3647716 (N.D. Cal. Aug. 23, 2012) ....................................... 16

*Inamed Corp. v. Kuzmak*,
   275 F.Supp.2d 1100 (C.D. Cal. 2002) .................................................. 13

*J'Aire Corp. v. Gregory*,
   24 Cal.3d 799 (1979) ........................................................................... 15

*LiMandri v. Judkins*,
   52 Cal.App.4th 326 (1997) ............................................................. 22, 23

*Mitchell Eng'g v. City & Cty. of S.F.*,
   2011 WL 13153042 (N.D. Cal. Feb. 14, 2011) ..................................... 21

*Monex Deposit Co. v. Gilliam*,
   680 F.Supp.2d 1148 (C.D. Cal. 2010) .................................................. 18

*Nat'l Med. Transp. v. Deloitte & Touche*,
   62 Cal.App.4th 412 (1998) ................................................................... 24

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
   823 F. App'x 516 (9th Cir. 2020) ......................................................... 16

*Overhill Farms, Inc. v. Lopez*,
   190 Cal.App.4th 1248 (2010) ............................................................... 19

*Patriot Rail Corp. v. Sierra R. Co.*,
   2011 WL 318400 (E.D. Cal. Feb. 1, 2011) ...................................... 16, 17

*Powertech Tech., Inc. v. Tessera, Inc.*,
   2014 WL 171830 (N.D. Cal. Jan. 15, 2014) .......................................... 16

*Ramona Manor Convalescent Hosp. v. Care Enters.*,
   177 Cal.App.3d 1120 (1986) ................................................................ 18

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
   77 F.3d 309 (9th Cir. 1995) ............................................................ 20, 24

*Richardson v. La Rancherita*,
   98 Cal.App.3d 73 (1979) ...................................................................... 24

*Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*,
   2 Cal.5th 505 (2017) ............................................................................ 15

iv

*Siam Numhong Prods. Co. v. Eastimpex*,
    866 F.Supp. 445 (N.D. Cal. 1994) ..................................................... 14, 25

*Straus v. De Young*,
    155 F.Supp. 215 (S.D. Cal. 1957) ............................................................ 14

*Vega v. Jones, Day, Reavis & Pogue*,
    121 Cal.App.4th 282 (2004) ...................................................................... 23

*Warner Constr. Corp. v. City of L.A.*,
    2 Cal.3d 285 (1970) ................................................................................... 21

*Weintraub Fin. Servs., Inc. v. Boeing Co.*,
    2020 WL 6162801 (C.D. Cal. Aug. 7, 2020) .......................................... 16

*Westside Ctr. Assocs. v. Safeway Stores*,
    42 Cal.App.4th 507 (1996) ....................................................................... 18

**Statutes**

Cal. Civ. Code § 1709 ....................................................................................... 18

Cal. Civ. Code § 1710 ....................................................................................... 18

Cal. Comm. Code § 1103(b) ...................................................................... 14, 25

Cal. Comm. Code § 2201 .................................................................................. 14

Cal. Comm. Code § 2309(2) ...................................................................... 14, 15

**Other Authorities**

CACI 2202 ......................................................................................................... 16

CACI 2204 ......................................................................................................... 16

Fed. R. Civ. P. 30(b)(6) .................................................................................... 14

## I.   **INTRODUCTION**

Defendants' Motion is predicated on misrepresentations and distortions of the factual record and misstatements of applicable law.  For instance, Defendants claim that Plaintiff The Santa Barbara Smokehouse, Inc. ("Smokehouse" or "SBS") "knew" of a supply cutoff because AquaChile's Alberto Valenzuela told SBS as much in April 2019.  Yet they hide the fact that a more senior AquaChile official, Vicente De La Cruz, phoned SBS the next morning and insisted that this was just a miscommunication, which SBS confirmed in writing that day, and he reaffirmed the continuity of supply by email soon thereafter.  Defendants also assert that the July 3, 2017 was not a binding contract because it was unsigned.  Yet they bury in a footnote the fact that Defendants signed a separate document (the June 6, 2019 agreement) that expressly acknowledged the July 3, 2017 agreement.  They also fail to mention they paid SBS $150,000 in damages for breaching the July 3, 2017 agreement.  Defendants' playing fast and loose with the facts is not surprising given that they deliberately hid "smoking gun" documents while flouting the Court's discovery order and lying about it, which is the subject of Plaintiffs' pending Motion for Sanctions (Dkt. No. 137).

Defendants' Motion is based on three easily demolished predicates:  (1) the July 3, 2017 agreement was not an enforceable agreement; (2) SBS supposedly "knew" of the impending complete supply cutoff; and (3) Plaintiffs' damages claim is speculative because Plaintiffs did not have a binding contract with Labeyrie.  The first predicate is readily refuted as already mentioned, in addition to other reasons.  The second is refuted not only by Defendants' witnesses' own statements but by ready explanations for all of the supposed "facts" Defendants mischaracterize.

The third is a straw man.  Plaintiffs do not contend that they had an enforceable contract with Labeyrie — nor do they need to.  Among other things, Plaintiffs' claims for interference with prospective economic advantage (IPEA) are distinct from interference with contract claims and require merely a showing that Plaintiffs and Labeyrie "were in an economic relationship that *probably* would have resulted in an

1

economic benefit."  California law requires neither a contract nor certainty.

As detailed below, there is overwhelming evidence not only that Plaintiffs and Labeyrie were in an economic relationship but that it was highly likely that the acquisition would close as described, allowing Plaintiffs to realize significant economic benefits. ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████ Defendants do not even try to show that anything actually existed that would have prevented a deal from closing.  That certain details still needed to be finalized does not mean that it was not "probable" that the deal would close timely and at the agreed-upon price.

## II.   COUNTER-STATEMENT OF FACTS

### A.   The Smokehouse's Prior Lawsuit Against Agrosuper's Subsidiary

SBS is a small but highly successful producer of premium smoked salmon in Santa Barbara, California.  It purchases raw salmon fillets from suppliers abroad, including in Chile, which it then processes in its plant in Santa Barbara.  SBS sells its products solely in the U.S. and does so under brands it licenses from DHBrands, which pays it a royalty based on SBS's sales revenue.  Add'l Mat. Facts ("AF") 83-84.

In late 2014, Listeria monocytogenes, commonly known as "Listeria" or "Lm," was detected in SBS's plant.  Lm is a species of bacteria that can be dangerous if consumed in sufficient quantities, especially by pregnant women and the infirm.  The discovery of Lm led to recalls that devastated SBS's business for a time.  AF 86-88.

SBS traced the Lm back to raw salmon fillets supplied by Agro America LLC ("Agro"), Defendant Agrosuper S.A.'s American subsidiary.  Agrosuper was and is a

2

1    multi-billion-dollar Chilean agribusiness behemoth.  SBS sued Agro in California

2    state court.  After two years of hard-fought litigation, the case settled.  AF 89-92.

3    **B.      The Smokehouse's July 3, 2017 Supply Agreement with AquaChile**

4         In the meantime, in 2015 SBS entered into a one-year supply agreement with

5    Defendant AquaChile, Inc. for "washed" fillets.  AquaChile, Inc., based in Miami,

6    Florida, was and is the American subsidiary of its Chilean parent Defendant Empresas

7    AquaChile S.A., and it was responsible for selling its parent's fish in the U.S.  The

8    term "AquaChile" will be used herein to refer to their combined operations.

9    "Washing" meant that the fish had been subjected to extended immersion in a calcium

10   hydroxide-based solution formulated to kill any Lm that might exist, along with

11   further sampling and testing for Lm before shipment to SBS.  AF 93-95.

12        After the supply agreement lapsed, SBS's CEO Tim Brown kept pushing

13   AquaChile, Inc.'s new general manager (CEO), Vicente De La Cruz, for another

14   supply agreement.  After emails and a phone call in July 2017, the parties had an in-

15   person meeting in Santa Barbara on July 20, 2017.  De La Cruz brought with him a

16   three-year supply agreement between SBS and AquaChile, Inc. dated July 3, 2017 for

17   washed and non-washed fish and presented it to Mr. Brown to sign, which he did.

18   The agreement specified approximate weekly volumes; set prices for fresh fish at an

19   index, with prices for frozen fish to be negotiated; specified a surcharge of $0.15 per

20   pound for "washed" fish; and obligated AquaChile to offer fresh fish at the same price

21   if shipments of frozen fish were delayed due to AquaChile's negligence.  AF 96-99.

22        De La Cruz did not sign the agreement at the meeting but said he wanted to

23   bring it back with him for a double-check.  Mr. Brown kept a copy of the agreement

24   he had signed, and De La Cruz took back the original.  Over the next month, Mr.

25   Brown followed up about obtaining a countersigned copy but did not receive one.

26   Nevertheless, AquaChile began substantially performing in accordance with the

27   agreement and Mr. Brown got busy, so he stopped following up.  Yet he and SBS

28   considered the July 3, 2017 agreement to be binding and enforceable.  AF 100-105.

3

**C.**     **Agrosuper Acquires Empresas AquaChile and Its Subsidiaries, and AquaChile Twice Reassures the Smokehouse of No Adverse Impacts**

In August 2018, Mr. Brown read a press report that Agrosuper had started the process of acquiring Empresas AquaChile and its subsidiaries.  Fearing retribution due to the Agro lawsuit, he phoned De La Cruz, whom he trusted, and related his concern.  De La Cruz reassured him, telling him that he "had [SBS's] back."  AF 108-110.

The acquisition closed in January 2019.  Mr. Brown was in Miami that month and met with De La Cruz, who again assured Mr. Brown of his support.  AF 111-112.

**D.**     ████████████████████████████████████████

████████████████████████████████████████

In late February 2019, it became known within the combined organization that the current head of Agrosuper's aquaculture division, Sady Delgado, would be taking over as the general manager (CEO) of Empresas AquaChile, which he officially did on April 2, 2019.  It also became known that certain personnel would be joining the "new" AquaChile, including De La Cruz and Raul Squadritto.  This was a promotion for De La Cruz, who would be returning to his native Chile as a highly placed Commercial Director at Empresas AquaChile reporting to Delgado.  Squadritto would be running the AquaChile U.S. operations and reporting to De La Cruz.  AF 113-121.

As part of this transition, ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████  This was a falsehood:  not only had ████████████
████, but ████████████████████████████████████
████████████████████████████████.  AF 122-127.

De La Cruz, who was to report directly to Delgado, was in a bind.  He knew

4

1  that AquaChile was bound to an existing supply agreement with SBS.  But he also did

2  not want to jeopardize his promotion and return to Chile.  So he sought to buy time,

3  telling Delgado:  ████████████████████████████████████████

4  █████████████████████████████████████████████████████████

5  █████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ██████████████████████████████████████████████████████████

8  ███████████████████████████████████████████. AF 128-133.

9      This ██████████ was put into effect.  Meanwhile, Delgado texted De La

10  Cruz ██████████████████████████████████. AF 134-136.

**E.    Defendants Cut Back Supply While Misleading the Smokehouse**

SBS noticed that the volumes AquaChile was offering were diminishing and

complained.  Then, on April 11, Valenzuela told Mr. Brown, Luis Pelayo (SBS's

CFO), and Sam Brown (SBS's operations manager) that he had been ordered to cut

off all supply by higher-ups in Chile as retribution for the Agro lawsuit.  AF 139-140.

The SBS representatives were stunned.  They wrote up a summary of the call,

sent it to De La Cruz, and copied SBS's lawyer.  De La Cruz sprang into action,

calling SBS the next morning, April 12, and insisting that this had just been a

miscommunication and that supply would continue.  SBS confirmed this conversation

in writing to De La Cruz and Valenzuela later that day, and Mr. Brown texted De La

Cruz, "I feel much better now."  Two weeks later, De La Cruz wrote to SBS advising

that there was difficulty continuing to perform the wash process, but he reaffirmed

AquaChile's intention to continue supplying non-washed fish.  AF 141-146.

**F.    The Smokehouse and Defendants Resolve Their Disagreements in**
**June 2019, and Defendants Ostensibly Reaffirm Continued Supply**

Despite the repeated assurances, SBS continued to receive reduced offers of

fish.  SBS complained but was told that there were valid reasons for the diminished

supply.  At no point did Defendants say they were cutting off supply, and in fact

5

expressed the opposite.  SBS also had incurred $150,000 in damages where a large quantity of frozen fish from AquaChile was late in arriving and AquaChile had failed to offer a replacement of fresh fish at the same price pursuant to the July 3, 2017 agreement, forcing SBS to cover on the spot market at higher prices.  AF 147-150.

In late May, SBS told Defendants that SBS would not make any payment until the supply issues were resolved and demanded that any cutoff be put in writing.  De La Cruz responded on June 1 that he would fly to California and meet with Mr. Brown to resolve the supply issues.  De La Cruz kept his subordinates informed.  AF 151-155.

In the meantime, SBS and DHBrands had started the process of selling their businesses. ███████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ ████████████████████████████████ ██████████████████████████████ █████████████████████████████████████.  By early June, SBS and DHBrands had several letters of intent (LOIs) in hand, which stated an anticipated price and relevant terms for a potential acquisition.  AF 156-161.

On June 5, 2019, De La Cruz met with Tim Brown, Luis Pelayo, and Sam Brown in Santa Barbara.  SBS understood that he was there on behalf of all three Defendants.  The meeting started out tensely, with Mr. Brown ventilating his concerns.  Mr. Brown, who also was serving as an agent of DHBrands, told De La Cruz that he and the brands owner (DHBrands) were in the process of selling their businesses and already had LOIs in hand, and he indicated that if AquaChile in fact was cutting off supply, it would derail the sale effort — and, in that case, the brands owner might sue SBS, and SBS would sue Defendants.  AF 162-166.

De La Cruz acknowledged vaguely that he was getting "pressure" from his superiors in Chile, though he said nothing about cutting off supply.  De La Cruz then

6

quickly smoothed things over.  He proceeded to reaffirm the supply arrangement by agreeing that AquaChile would pay $150,000 in damages for breaching the July 3, 2017 agreement by supplying several frozen containers (in addition to fresh fish) while charging SBS a reduced price.  The meeting ended very positively. AF 167-169.

The parties memorialized their oral agreement in a written agreement dated June 6, 2019.  Mr. Pelayo drafted the two-page agreement and sent it to De La Cruz, who not only reviewed it but made changes to it.  De La Cruz then initialed the first page and signed and returned the agreement, which SBS countersigned.  AF 170-172.

The June 6, 2019 agreement, among other things, explicitly acknowledged the existence and efficacy of the July 3, 2017 agreement, stating in the middle of the first page:  "SBS incurred $150K damages for . . . Delayed / non-shipped containers as referenced in the agreement dated July 3, 2017."  All three Defendants have confirmed under oath that "the agreement dated July 3, 2017" mentioned in the June 6, 2019 agreement is the *particular document* that Plaintiffs have identified as the July 3, 2017 agreement.  The June 6, 2019 agreement said nothing about termination of supply or any cutoff.  The agreement also "acknowledged" that "Vicente De La Cruz is an agent/officer for Agrosuper / AquaChile (AquaChile)," and De La Cruz signed it on behalf of "Agrosuper / AquaChile (AquaChile)."  A few days later, De La Cruz reaffirmed the continued supply, telling Mr. Brown, "I will . . . make sure [AquaChile] offer[s] you volumes [of fresh fish] every week."  Mr. Brown spoke with Valenzuela soon thereafter, mentioned the positive resolution, and also mentioned to him that Plaintiffs were selling their businesses and had LOIs in hand.  AF 173-178.

Unbeknownst to Plaintiffs, De La Cruz was defrauding them.  De La Cruz, who had the authority to end supply, testified that ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████.  It now is evident why: ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

PLS.' MEM. OF P.'S AND A.'S IN OPP. TO DEFS.' MOT. FOR SUMM. J.

█████████████████████████████████████████████████

████████████████████████. Thus, he decided to mislead Plaintiffs into believing that supply would continue so that AquaChile could collect payment and avoid a lawsuit while he developed a new "████████ AF 146, 181, 183-187.

**G.**   ████████████████████████████████████

████████████████████████████████████

With Defendants having (fraudulently) reassured Plaintiffs that the supply relationship was intact, Plaintiffs proceeded with the sales process.  AF 163-177, 183-187.  Among those Mr. Roberts had contacted in May 2019 was ████████████ ████████████████████████████ Labeyrie, a French purveyor of smoked salmon and other specialty foods.  They also included BP, ████████████ ████. Labeyrie and the others received ████████████████████. AF 188-191.

By early June, Plaintiffs had received LOIs from three potential buyers, including BP, and they received one from Labeyrie ████████. ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████. AF 192-200.

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

---

[1] EBITDA stands for earnings before interest, taxes, depreciation, and amortization; adjusted EBITDA also takes out non-recurring items.  AF 195.

8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28 . AF 216-220.

9



Defendants offer *no evidence* that there was any *real* possibility of a material problem arising ███████████████████████.[4]  AF 224.  ████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████  .  Resp. to UF 61-62; AF 197, 226, 286.

**H.   Defendants Repeatedly Mislead Plaintiffs to Believe Supply Will Continue While They Seek to Gradually Exit the Relationship**

In the meantime, De La Cruz and his underlings deliberately misled SBS into believing that supply would continue while trying to encourage SBS to voluntarily part ways.  For example, on August 5, 2019, De La Cruz told Mr. Brown, "We are not able to keep doing washed fish.  I push every day so they don't [*sic*] stop until we fill

---

[2] Mr. Roberts' statement that ████████████████████████████████████████████  .  AF 223.

[3] ████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████  .  Resp. to UF 60.

[4] ████████████████████████████████████████████████

███████████████████████████████████████████████████  .  AF 225.

[*sic*] our commitment, but will not be able to push it further." This *necessarily*
implied that AquaChile would continue supplying SBS with *non-washed* fish *after* the
frozen containers were in, since otherwise the information would be meaningless.
Although Mr. Brown was unhappy about the potential washed fish situation, he
understood he could still buy non-washed fish from AquaChile.  De La Cruz also told
Mr. Brown that after fulfillment of the containers identified in the June 6, 2019
agreement they would not be able to supply *frozen* fish to the Smokehouse for some
time but said nothing about terminating the supply of fresh fish.  AF 230-234.

Yet, on August 10, De La Cruz told Squadritto, ███████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████.  AF 237-239.
███████████████████████████████████████████
███████████████████████.  This was a key step of the "washing" process to
which AquaChile had agreed.  AquaChile continuing to collect an additional $0.15 per
pound while saying nothing to SBS about ██████████████████████████.
AquaChile also ████████████████████████████.  AF 240-246.

Throughout this time, AquaChile remained one of SBS's principal suppliers.
Had Mr. Brown known that AquaChile already had decided to repudiate the contract
and end supply soon, he would have successfully taken immediate measures to protect
the sale of the businesses by shoring up alternative supply in orderly fashion.  Though
SBS did have alternative suppliers, they had only so much capacity, meaning that SBS
could not replace its full requirements promptly.  To be sure, Mr. Brown was under no
illusions that Agrosuper liked him, and he knew that AquaChile might stop supplying
SBS after the 2017 agreement expired in July 2020.  But, by then, SBS would be part
of the Labeyrie group, which would have better access to supply.  AF 247-256.

Feeling confident in SBS's present supply situation, Mr. Brown traveled to the
U.K. over the weekend of September 28-29, 2019, from where he planned to travel to

1   ███████████████████████████████████████████████████. AF 257.

2   **I.    Defendants Cut Off All Supply, Causing Plaintiffs' Deal to Collapse**

3   Behind the scenes, De La Cruz's new plan for a smooth exit from SBS hit a

4   snag. ██████████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████. AF 258-262.

7   De La Cruz knew that Delgado would discover that AquaChile was still selling

8   to SBS and would be incensed. He decided to get out in front of the matter. He texted

9   Delgado and told him about the report, acknowledged that the "instruction" was not to

10  sell to SBS, and promised to stop all sales, which he then ordered. AF 263-264.

11  On September 30, 2019, Valenzuela advised Mr. Pelayo of SBS by phone that

12  all supply would cease after the present order was fulfilled. Mr. Pelayo informed Mr.

13  Brown, who was in the U.K. Mr. Brown frantically emailed De La Cruz to find out if

14  this cutoff was for real, unlike what had happened in April. He finally spoke with De

15  La Cruz and explained that he was supposed to have dinner with the prospective buyer

16  of the businesses and that this cutoff would ruin the deal. De La Cruz confirmed that

17  AquaChile was ending all supply but offered no valid reason. AF 265-269.

18  ████████████████████████████████████████████

19  ██████████████████████████████████████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████████████

22  ██████████████████████████████████████

23  ████████████████████████████████████████████

24  ██████████████████████████████████████

25  ██████████████████████████████████████████████

26  ██████████████████████████████████████████████

27  ███████████████████████████████████████████.

28  Plaintiffs then went back to their fallback acquirer, BP, with whom they had last

spoken in August.[5] ████████████████████████████████████

███████████████████████████████████████████████████

  ██████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████. Thus,

not even the onset of the COVID-19 pandemic would have derailed closing on the

deal with Labeyrie but for the AquaChile supply cutoff.  AF 228, 284-287.

## III.   DEFENDANTS' MOTION SHOULD BE DENIED IN ITS ENTIRETY

### A.   Ample Evidence Supports the Existence and Validity of the July 3, 2017 Agreement and AquaChile's Breach of That Agreement

#### 1.   The July 3, 2017 Agreement Was an Enforceable Contract

Distortions of the record aside (*see* AF 97-107), Defendants' efforts to deny the

enforceability of the July 3, 2017 agreement are unavailing given applicable law and

Plaintiffs' evidence.  Defendants cannot dispute that the July 3, 2017 agreement is

sufficiently definite to be enforceable.  *See, e.g.*, *Inamed Corp. v. Kuzmak*, 275

F.Supp.2d 1100, 1120 (C.D. Cal. 2002).  AquaChile recognized that the July 3, 2017

agreement was enforceable by substantially performing under it and, later, *paying*

*$150,000 in damages for breaching that agreement*, as Defendants *explicitly* con-

firmed in the June 6, 2019 agreement they signed.  AF 104, 168, 173, 174, 179, 180.[6]

---

[5] ████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████. AF 279-281.

[6] Defendants' claim in a footnote that the Court already rejected this argument

is baseless.  Defendants take a line out of context from the Court's July 7, 2020 Order

that the June 6, 2019 agreement did not "endorse[] . . . the terms and obligations of the

July 2017 agreement."  In fact, the Court was addressing an entirely different issue:

Plaintiffs' contention at the time that Empresas AquaChile's and Agrosuper's

execution of the June 6, 2019 agreement *bound them* (separate and apart from

AquaChile, Inc.) to the July 3, 2017 agreement.  That is wholly irrelevant here.

Thus, Defendants fall back on invoking the statute of frauds. This, too, falls flat. Under California law, "[a] memorandum signed by the party to be charged which forms no part of the contract, but which recognizes the existence of a contract, is a sufficient memorandum [for purposes of the statute of frauds], and parol evidence is admissible to establish the same." *Straus v. De Young*, 155 F.Supp. 215, 219 (S.D. Cal. 1957);[7] *see also Siam Numhong Prods. Co. v. Eastimpex*, 866 F.Supp. 445, 449-50 (N.D. Cal. 1994) (letter of credit satisfied statute of frauds by indicating contract had been made). That is exactly the case here. De La Cruz signed the June 6, 2019 agreement, which expressly referenced the "agreement dated July 3, 2017," and all three Defendants' Rule 30(b)(6) designees admitted that this refers to the *particular* document that Plaintiffs contend is the July 3, 2017 agreement. AF 172, 176.

If that were not enough, AquaChile is estopped to assert the statute of frauds due to its partial performance, SBS's reliance thereon, and the unconscionability of finding it unenforceable. *See, e.g.*, *Allied Grape Growers v. Bronco Wine Co.*, 203 Cal.App.3d 432, 444 (1998). AquaChile partially performed on the contract in at least two ways: by supplying fish generally in accordance with its terms starting in August 2017 and by paying $150,000 in damages for breach. AF 104, 168, 173, 174, 179, 180. SBS relied on AquaChile's performance to its detriment, first, by conducting its business without seeking substantial replacement supply and, then, by continuing in June 2019 with the process of selling its business without taking measures it could have taken to protect the sale. AF 106, 180, 252. AquaChile cannot avoid the contract.

### 2. The Agreement Was Not Terminable at Will, at Least in 2019

Defendants try to deny AquaChile's breach of the July 3, 2017 agreement by claiming that it was "at will" because it was supposedly indefinite. Defendants are wrong. California Commercial Code Section 2309(2) does not apply because the

---

[7] That *Straus* predates the Commercial Code does not diminish its force. Section 2201 refers expansively to "some writing," and principles of law not displaced by the Code may supplement its provisions. Cal. Comm. Code §§ 1103(b), 2201.

14

agreement was *not* "indefinite in duration."  Rather, it specified "the period of August 2017 through July 2020."  Resp. to UF 48 and 66; AF 254.  The only thing indefinite was the *renewal* provision.  AF 255.  While the renewal provision itself may be unenforceable, California law would disfavor interpreting the agreement so as to render the explicit "August 2017 through July 2020" language "nugatory or inoperative."  *See Founding Members of Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal.App.4th 944, 957 (2003).

Even if the entire agreement somehow could be considered indefinite, the agreement was enforceable throughout 2019.  Section 2309(2) provides that if the contract is indefinite in duration "it is valid for a reasonable time."  Under California law, the contract becomes at will only *after expiration* of that "reasonable time."  *See Consolidated Theaters, Inc. v. Theatrical Stage Employees Union*, 69 Cal.2d 713, 727-28 (1968).  Here, that "reasonable time" necessarily would be the three years specified in the agreement, since that was the parties' contemplation, especially since it was *AquaChile* that drafted the contract.  *See id.* at 725 (parties' intention as to duration can be implied from nature of contract and surrounding circumstances).

## B.   Ample Evidence Supports Plaintiffs' IPEA Claims

### 1.   An Economic Relationship Between SBS and Labeyrie with a Probability of a Future Economic Benefit Existed

Plaintiffs' IPEA claims require a showing of "(1) an existing economic relationship that (2) contains the probability of an economic benefit to the plaintiff."  *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 2 Cal. 5th 505, 512 (2017).[8]

Courts applying California law take an expansive view of what gives rise to an "existing economic relationship."  This Court, for example, has recognized that

---

[8] Defendants cite *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 808 (1979), but do not explain how it applies.  Here, the harm from misleading Plaintiffs and then cutting off supply was foreseeable, as told De La Cruz on June 5 the consequences of any cutoff.  AF 166.  Foreseeability also is generally a question of fact for the jury.  *Fields v. Mobile Messengers Am., Inc.*, 2013 WL 6774076, at *4 (N.D. Cal. Dec. 23, 2013).

15

existing economic relationships may exist with *potential* customers for purposes of an IPEA claim. *Code Rebel, LLC v. Aqua Connect, Inc*., 2013 WL 5405706, at *6-7 (C.D. Cal. Sept. 24, 2013) (Lew, J.) (finding allegations of economic relationships with "actual and potential customers" and "infringement on Defendant's existing patents to potential customers" sufficient to state IPEA claim). The existence of "substantive negotiations" with a potential customer readily satisfies the economic relationship standard. *See, e.g.*, *Powertech Tech., Inc. v. Tessera, Inc*., 2014 WL 171830, at *11 (N.D. Cal. Jan. 15, 2014) (denying summary judgment based on ongoing "licensing negotiations" with a prospective customer); *see also Impeva Labs, Inc. v. Sys. Plan. Corp*., 2012 WL 3647716, at *6 (N.D. Cal. Aug. 23, 2012) (denying motion to dismiss based on alleged business discussions and response to RFP).

Courts are similarly liberal in finding factual circumstances that can support the probability of an economic benefit. The "general terms of a letter of intent" may be sufficient to establish such a probability. *See Weintraub Fin. Servs., Inc. v. Boeing Co*., 2020 WL 6162801, at *8 (C.D. Cal. Aug. 7, 2020). Moreover, a deal is not "speculative" merely because there are additional approvals needed. For example, in *Patriot Rail Corp. v. Sierra R. Co*., 2011 WL 318400 (E.D. Cal. Feb. 1, 2011), the court denied summary judgment although the final decisionmaker, Kelley, looked disfavorably on the plaintiff's submission. The court ruled: "A trier of fact could . . . find that it was reasonably probable based upon normal practice that Kelley would not have overridden a [future] finding of the board, and thus, Sierra could have secured the bid despite Kelley's personal opinion to the contrary." *Id.* at *8-9. A plaintiff is not required to prove certainty, only probability. *See Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 823 F. App'x 516, 518-19 (9th Cir. 2020); CACI 2202, 2204.

Plaintiffs readily establish both an existing economic relationship and a probability of an economic benefit. ███████████████████ ████████████████████████████████████████████████ ██████████████████████. AF 159-161, 188-192. In early June 2019, SBS

16

1   had several LOIs in hand, which stated an anticipated price and relevant terms for a

2   potential acquisition.  AF 193.  SBS further received a detailed LOI from Laberyie 

3   . AF 194.

17   Defendants cannot show, as a matter of law, that the deal was speculative.  AF 224.[9]

18          Defendants' discussion assumes that a contract must be in place or all terms

19   agreed on.  Mem. at 23.  That is not the law.  For example, in *Fifty-Six Hope Rd. v.*

20   *Jammin Java Corp.*, 2017 WL 2457487 (C.D. Cal. Jan. 25, 2017), the court rejected

21   the assertion that an economic benefit was not reasonably probable merely because

22   "there was no funding commitment or other business relationship."  The court found

23   _____

24   [9]

28   . See Resp. to UF 60.

that a letter of intent and "numerous calls and meetings between the parties for the purpose of continuing to work towards a deal" precluded that conclusion. *Id.* at *12.[10]

Defendants make virtually no effort to cite law to support their position. Citing *Westside Ctr. Assocs. v. Safeway Stores*, 42 Cal. App. 4th 507 (1996), Defendants claim that "proof of the reasonable probability of the transaction being successful at the initial offer price is necessary for Plaintiffs to prevail." Mem. at 23. *Westside Center* says no such thing. That case stands only for the proposition that an IPEA plaintiff cannot establish an economic relationship based on the existence of an undifferentiated class of unknown, hypothetical prospective customers. *Id.* at 523-27.

### 2. Defendants Committed Wrongful Acts

Plaintiffs readily establish that Defendants engaged in wrongful acts for purposes of their IPEA claims: an ongoing pattern of fraudulent concealment of the fact that AquaChile had already decided to repudiate the July 3, 2017 supply agreement in the near future, beginning with De La Cruz's misleading partial disclosures to Plaintiffs at the June 5, 2019 meeting in Santa Barbara and continuing with misleading statements he made on the subject through June and August 2019.[11] *See* AF 163-181, 229-235, 249. This course of conduct is discussed in Part III.C below.

### 3. Defendants Had Knowledge of the Economic Relationship

Defendants further assail Plaintiffs' IPEA claim by contending that they did not know of the sale to Labeyrie in particular. But Plaintiffs were not required to identify the specific party with whom they were in the process of working towards a deal to satisfy this element. *Ramona Manor Convalescent Hosp. v. Care Enters.*, 177 Cal. App. 3d 1120, 1127 (1986) (sufficient that defendant was aware that plaintiff was "negotiating a new operating lease with an unnamed third party"); *Monex Deposit Co. v. Gilliam*, 680 F.Supp.2d 1148, 1162-63 (C.D. Cal. 2010) (summary judgment denied

---

[10] *Fifty-Six Hope Road* found no reasonable probability for a reason not present here, namely that the counter-defendants effectively could veto the deal. *See id.*

[11] Such conduct is proscribed by Cal. Civ. Code §§ 1709-1710.

where defendant knew that plaintiff had several unnamed business relationships, even though defendant did not have knowledge of a specific relationship).

That the Laberyie LOI was not sent until ███████ does not assist Defendants. At the June 5 meeting, Mr. Brown made clear to De La Cruz that Plaintiffs were selling their businesses, that they already had LOIs in hand, and that if AquaChile cut off supply, a deal would be ruined, the brands owner would come after SBS, and SBS would come after AquaChile.  AF 166.  By this point, ████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████.  AF 191-194.  Defendants' wrongful acts, in the form of misleading partial disclosures, continued periodically after June 5 and at least well into August.  See III.C below.  Thus, Defendants were well aware of one or more economic relationships between Plaintiffs and third parties at the time they were committing wrongful acts and knew that any such relationships would be disrupted if they continued to conceal the decision to cut off supply in the near future.

### 4.    Causation Is Readily Established

Defendants' assertion that the supply cutoff could not have caused Labeyrie to back out of the deal is readily refuted by the explicit statement provided on October 11, 2019, by Labeyrie's CEO that it was terminating the discussions "due to the issue with the SBS' key Chilian [*sic*] supplier," which was truthful.  AF 277.  Even if, *arguendo*, the cutoff combined with other reasons to cause Labeyrie to pull out, causation is still established under California's "substantial factor" standard, *Franklin v. Dynamic Details, Inc*., 116 Cal.App.4th 375, 391 (2004) (IPEA claim), which "requir[es] only that the contribution of the individual cause be more than negligible or theoretical." *Bockrath v. Aldrich Chem. Co*., 21 Cal.4th 71, 79 (1999).  In addition, the timing between the cutoff and Labeyrie's pullout alone may be sufficient to prove causation. *See Overhill Farms, Inc. v. Lopez*, 190 Cal.App.4th 1248, 1267 (2010).

Regardless, Defendants' argument misunderstands Plaintiffs' claims and misrepresents the facts.  Defendants destroyed the Labeyrie deal by misleading

19

Plaintiffs from June through September 2019 into believing that they were honoring the 2017 agreement despite already having made a decision to repudiate the contract and cut off supply soon. *See* AF 163-185, 229-235, 249. This deception caused Plaintiffs to refrain from taking steps that would have preserved the deal, including by lining up adequate alternative supply. AF 250.

AquaChile's abrupt cutoff thus was devastating to the deal for two reasons acting in combination. First, it was the *timing* of the cutoff that was so impactful: on the eve of a meeting in Paris with Labeyrie and its shareholders, which Mr. Brown had to cancel to address the supply situation.[12] Second, it was the *message* that the cutoff conveyed to Labeyrie: a *sudden* cutoff of supply by a *longstanding supplier*, AquaChile, *without forewarning and with no business justification* suggested that something was seriously wrong with SBS. AF 265-275. That is fundamentally different from the situation that Defendants posit (which Plaintiffs dispute, Resp. to UF 66) that SBS was supposedly considering *reducing its purchases* from AquaChile.

For these reasons, Defendants' fixation on the fact that SBS had alternative suppliers is irrelevant. Defendants also are wrong there was no impact on SBS's operations. Because AquaChile was still responsible for a very significant share of SBS's supply ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████. AF 284-285.

### 5. Damages Are Not Speculative

Defendants' argument that damages are speculative is largely based on a straw man: their lengthy discussion of an entirely irrelevant case, *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309 (9th Cir. 1995), for the proposition that an LOI is not a

---

[12] Nor can Defendants point to Mr. Brown's decision to cancel the Paris dinner as absolving them of liability, since he only did so due to Defendants' conduct. *See Cline v. Reetz-Laiolo*, 329 F.Supp.3d 1000, 1034 (N.D. Cal. 2018); AF 268-271.

binding contract.  Plaintiffs do not contend that Labeyrie's LOI was binding.  But that is beside the point.  As discussed in Part III.B.1 above, the tort of IPEA specifically assumes that damages may be recoverable in the absence of a binding contract. Plaintiffs have made the requisite showing.  "To require more would be to eliminate the effectiveness of the tort."  *Fifty-Six Hope Rd.*, 2017 WL 2457487, at *12.

Defendants also suggest that damages are speculative because there was no material impact on profits.  But Plaintiffs are not using a lost profits measure of damages.  Rather, Plaintiffs are seeking damages based on, *inter alia*, ███████ ███ (AF 288), which is a well-established and distinct method of calculating harm to a going-concern business due to a defendant's tortious conduct.  *See, e.g.*, *Mitchell Eng'g v. City & Cty. of S.F.*, 2011 WL 13153042, *9-11 (N.D. Cal. Feb. 14, 2011).

## C.  Ample Evidence Supports Plaintiffs' Fraudulent Concealment Claim

Plaintiffs readily show that Defendants had a duty to disclose their decision to cut off supply to the SBS in the near future, which De La Cruz testified was made days before the June 5 meeting, AF 181, and that the concealment sounds in fraud.  A duty to disclose arises in three relevant circumstances: "(1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant . . . ; (3) the defendant actively conceals discovery from the plaintiff."  *Warner Constr. Corp. v. City of L.A.*, 2 Cal.3d 285, 294 (1970).

Plaintiffs meet each of these.  First, Defendants made repeated misstatements and half-truths designed to conceal the cutoff decision, where they knew that SBS was concerned about supply, in order that Defendants could stave off a lawsuit and De La Cruz could buy time to plot a new ████████████ that would ███████████████. Defendants made actionable misleading statements on, *inter alia*, June 5, June 6, June 10, August 5, and August 16.  AF 163-187, 229-257.  Second, these facts were known and accessible only to Defendants.  Third, Defendants prevented Plaintiffs from discovering the cutoff decision by reassuring SBS about supply.

1    Defendants' deceptive intent is self-evident. ████████████████

2  ████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  demonstrate that Defendants aimed to keep SBS in the dark.  AF 133, 237.

5    Defendants' claim that Plaintiffs "knew" grossly misstates the record.  For

6  instance:  (a) De La Cruz reassured Mr. Brown in August 2018 and January 2019 that

7  he "had [his] back"; (b) although Valenzuela did tell SBS on April 11, 2019 that

8  AquaChile was "terminating," the next morning De La Cruz called and stated this was

9  a miscommunication; (c) while SBS had been "cutting back" in May 2019, the matter

10  was resolved when the parties met in person on June 5, 2019 and signed an agreement

11  the next day; (d) the "supply stoppage" referenced in an email exchange related to a

12  gap in *frozen* fish, not fresh fish; (e) De La Cruz's email to SBS on August 5 stating

13  that AquaChile that the washing process would end after it fulfilled the frozen

14  shipments under the June 6, 2019 agreement *necessarily* implied that Defendants

15  would continue to supply *non-washed* fish thereafter (otherwise, what was the point of

16  telling SBS?); and (f) Mr. Brown's September 27 email about not going forward "next

17  year" reflected the *expiration of the July 2017 agreement in July 2020*.  Resp. to UF

18  45, 48, and 49; AF 110, 138, 140-144, 163-172, 229-230.

19    Further, the reasonableness of reliance is rarely suitable for determination as a

20  matter of law.  *See Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1067 (2012).

21    Defendants also bury in a footnote an argument that they had no duty to

22  disclose an intent to commit a wrongful act, citing *LiMandri v. Judkins*, 52

23  Cal.App.4th 326, 338 (1997).  Defendants misstate Plaintiffs' claim.  Defendants are

24  liable to Plaintiffs because they made a *past* decision (in early June) to cut off all

25  supply to SBS in the near future despite the July 3, 2017 agreement and then misled

26  Plaintiffs into believing supply would continue, in order that Defendants could collect

27  on SBS's balance and stave off a lawsuit.  Having "volunteer[ed] information," they

28  were required to "be truthful, and [their] telling of . . . half-truth[s] calculated to

22

deceive [was] fraud." *Vega v. Jones, Day, Reavis & Pogue*, 121 Cal.App.4th 282, 292 (2004).  Moreover, AquaChile, Inc.'s breach of the 2017 supply agreement would not be a "wrongful act," which connotes *tortious* conduct, but just a breach of contract.

*LiMandri* also is inapposite because all three Defendants had a sufficient relationship with SBS to give rise to a duty to disclose.  First, California law construes such a relationship expansively.  *See Vega*, 121 Cal.App.4th at 292 (law firm for contracting party was subject to independent liability for fraudulent concealment). Here, De La Cruz, an employee of Empresas AquaChile, was acting on behalf of all three Defendants in, *inter alia*, resolving the dispute over the July 3, 2017 agreement in June 2019.  Second, apart from AquaChile, Inc., the other two Defendants entered into the June 6, 2019 agreement with SBS to resolve the breach of the July 3, 2017 agreement, establishing a direct contractual relationship.  Third, the Chilean defendants are liable for aiding and abetting AquaChile, Inc.'s fraud.[13]  AF 146, 164, 176.

Finally, causation and damages are discussed Parts III.B.4 and 5 above.

Defendants' arguments as to DHBrands fail.  Brown was an agent of both SBS and DHBrands, and he told De La Cruz on June 5, 2019 that both entities would be harmed by a supply cutoff.  AF 162, 166.  The subsequent half-truths about continued supply that Defendants told to Brown directly and foreseeably caused DHBrands' losses.  *Vega*, 121 Cal.App.4th at 292; *Hynix Semiconductor Inc. v. Rambus Inc.*, 2007 WL 4209399, at *8 (N.D. Cal. Nov. 26, 2007) (fraud liability extends to losses of third parties to whom speaker has reason to know misstatement will be related).

## D.   Ample Evidence Establishes Agrosuper's Liability

Plaintiffs have presented sufficient facts to hold Agrosuper liable either directly or for aiding and abetting as to the fraud, inducement, and interference claims.  While still with Agrosuper, ████████████████████████████████████████

---

[13] Although the FAC expressly alleges aiding and abetting liability against Agrosuper only, the facts support the same theory as to Empresas AquaChile, and leave to amend should be granted if the Court deems amendment necessary.

1 ████████████████████████████████████████████████████

2 ████████████████████████████████. AF 124, 135-136.  De La Cruz

3 also was acting as an "agent/officer" of Agrosuper in the June 5 meeting and when he

4 signed the June 6, 2019 agreement.  AF 162, 166.  Agrosuper also helped prepare the

5 █████████████████████████████████████████ AF 259.  At a

6 minimum, all of this conduct subjects it to aiding and abetting liability.  *See, e.g.*,

7 *Gonzales v. Lloyds TSB Bank, PLC*, 532 F.Supp.2d 1200, 1207-08 (C.D. Cal. 2006).

8 **E.    Ample Evidence Supports Plaintiffs' Contract Interference Claims**

9 Plaintiffs can show each element of this tort.  As established in Part III.A above

10 there was a contract in place, the 2017 supply agreement; Empresas AquaChile and

11 Agrosuper acted with the intent to disrupt it; and the contract was breached when

12 AquaChile, Inc. stopped supplying SBS with fish on or about September 30, 2019.

13 Empresas AquaChile and Agrosuper therefore fall back on their affirmative

14 defense of "privilege."  Mem. at 25.  They cannot make the requisite showing that

15 there are no triable issues of fact that they "(1) . . . ha[d] a legally protected interest,

16 (2) in good faith threaten[ed] to protect it, and (3) . . . by appropriate means."

17 *Richardson v. La Rancherita*, 98 Cal.App.3d 73, 81 (1979).  As shown in Part II

18 above, they interfered with SBS's 2017 contract out of retribution for the prior

19 lawsuit.  Moreover, their conduct was irrational, as ██████████████████

20 ████████████  AF 289, yet chose ████████ over sound business practices.  And

21 they advanced this goal using improper means, fraud.  They cannot prevail.

22 **F.    Ample Evidence Supports Plaintiffs' Breach of Contract Claim**

23 Defendants' arguments as to Plaintiffs' breach of contract claim against

24 AquaChile, Inc. have already been addressed in detail in Part III.B above.  Nor do

25 Defendants' cited authorities assist them.  *Rennick*, *supra*, is inapposite because

26 Plaintiffs are not seeking to enforce the Labeyrie LOI as a binding contract.

27 Defendants do not even attempt to show how the facts in *Nat'l Med. Transp. v.*

28 *Deloitte & Touche*, 62 Cal.App.4th 412 (1998), are similar to those in this case.

**G.     Ample Evidence Supports Plaintiffs' Promissory Estoppel Claim**

Defendants' arguments as to Plaintiffs' promissory estoppel claim fail for the same reasons that they are estopped to assert the statute of frauds.  *See* Part III.A.1 above; *see also Siam Numhong*, 866 F.Supp. at 451 n.8.  Defendants also wrongly claim that Plaintiffs advised Labeyrie that SBS did not rely on AquaChile's supply by stating that ███████████████████████████████████████ Mem. at 18.  In fact, this was accurate, because at the anticipated time of closing there would be less than 12 months remaining on the July 3, 2017 supply agreement.  AF 256.

**H.     AquaChile's Fraud Bars Its Counterclaims**

AquaChile's attempt to obtain summary judgment on its counterclaims fails because it cannot establish the absence of a triable issue of fact on SBS's Eleventh Affirmative Defense, for Negligent or Intentional Misrepresentation, which is a complete defense to AquaChile's counterclaims.  *See Bowmer v. H.C. Louis, Inc.*, 243 Cal.App.2d 501, 502 (1966) (fraudulent misrepresentation is a valid defense to a contract claim).[14]  It is unequivocal that Defendants deliberately sold fish to SBS that it misrepresented as "washed" and collected an additional $0.15 per pound as a result.  AF 242.  ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████  AF 240-241. ████████████████████████████████ ████████████████  AF 244.  Instead of informing SBS, AquaChile continued to bill and collect an additional $0.15 per pound of fish.  AF 246.  Had SBS known the truth, it would not have purchased the fish, let alone paid extra for it.  AF 247.[15]

**IV.     CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion in full.

---

[14] The common-law defense of fraud applies.  *See* Cal. Comm. Code § 1103(b).
[15] AquaChile's claim that SBS made a profit is irrelevant.  And SBS did not find out about ██████████████████████████████████████████████ ██████████████████ until January 2022, and it did not suspect anything was amiss until November 2019, when there was virtually no fish left.  AF 95, 240-248.

DATED:  February 1, 2022

BLANK ROME LLP

By: /s/ David A. Thomas
       David A. Thomas
       Nicole B. Metral
       Erica R. Graves
       Allen Ho

Attorneys for Plaintiff and Counter-Defendant The Santa Barbara Smokehouse, Inc. and Plaintiff DHBrands Limited