'O'

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE SANTA BARBARA SMOKEHOUSE, INC., a California corporation; and DHBRANDS LIMITED, a Cyprus limited liability company,<br><br>          Plaintiffs,<br><br>     v.<br><br>AQUACHILE, INC., a Florida corporation; AGROSUPER S.A., a Chile corporation; and EMPRESAS AQUACHILE S.A., a Chile corporation,<br><br>          Defendants. | CV 19-10733-RSWL-JEMx<br>**[REDACTED]**<br>**ORDER re: Defendants' Motion for Summary Judgment** [129];<br>**Defendants' Objections and Motion to Strike** [165];<br>**Defendants' Motions in Limine** [196, 197, 198];<br>and **Defendants' Motion to Exclude** [206] |
| AQUACHILE, INC., a Florida corporation,<br><br>     Counter-Plaintiff,<br><br>     v.<br><br>THE SANTA BARBARA SMOKEHOUSE, INC., a California corporation,<br><br>     Counter-Defendant. | |

Plaintiffs The Santa Barbara Smokehouse ("Smokehouse") and DHBrands Limited ("DHBrands") bring this Action, asserting the following claims for relief against Defendants AquaChile, Inc. ("AquaChile"); Agrosuper S.A. ("Agrosuper"); and Empresas AquaChile S.A. ("Empresas"): (1) breach of contract; (2) promissory estoppel; (3) fraudulent concealment; (4) aiding and abetting fraudulent concealment; (5) intentional interference with prospective economic advantage; (6) negligent interference with prospective economic advantage; (7) inducing breach of contract; (8) intentional interference with contractual relations; (9) intentional interference with prospective economic advantage; and (10) negligent interference with prospective economic advantage.  AquaChile has asserted counterclaims against Smokehouse for breach of contract and promissory estoppel.

Currently before the Court are Defendants' Motion for Summary Judgment [129]; Motion to Strike [165]; Motions in Limine [196, 197, 198]; and Motion to Exclude [206].  Defendants seek summary judgment on all of Plaintiffs' claims, as well as on AquaChile's counterclaims for breach of contract.  Having reviewed all papers submitted pertaining to this Motion, the Court **NOW FINDS AND RULES AS FOLLOWS**: the Court **GRANTS** Defendants' Motion for Summary Judgment in its entirety. The Court **DENIES** Defendants' Motion to Strike and **OVERRULES** Defendants' objections.  Given the Court's

ruling on the Motion for Summary Judgment, the Court **DENIES** Defendants' Motions in Limine and Motion to Exclude **as moot.**

## I. BACKGROUND

### A. Factual Background

Smokehouse is a California corporation. Defs.' Stmt. of Uncontroverted Facts ("Defs.' SUF") ¶ 1, ECF No. 129-2.[1] DHBrands owns the brands under which Smokehouse sells its salmon products, and Smokehouse pays DHBrands a percentage of Smokehouse's revenues in exchange for use of the brands. Id. ¶ 4. AquaChile is a supplier of salmon fillets and is a wholly owned subsidiary of Empresas. Id. ¶¶ 6, 8. Both AquaChile and Empresas are owned by Agrosuper. Id. ¶ 7.

In 2015, Smokehouse and AquaChile entered into a one-year supply agreement whereby AquaChile would supply Smokehouse with various salmon fillets, and Smokehouse would pay a price per pound that was negotiated monthly. Id. ¶ 9. This agreement expired in April 2016, but AquaChile continued to supply fillets to Smokehouse on a per-order basis. Id. ¶ 10. When Smokehouse later sought assurance that AquaChile would continue supplying

_____

[1] The Court relies on Defendants' Statement of Uncontroverted Facts [129-2] to the extent those facts are not controverted by Plaintiffs' Response [150-4]. See C.D. Cal. L.R. 56-3. A fact is considered controverted only where a "genuine" factual dispute exists. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court relies on Plaintiffs' Additional Material Facts to supplement the factual record where appropriate. Where any material facts are controverted, the Court will indicate as much.

it with salmon fillets at Smokehouse's election, AquaChile proposed a five-month supply agreement.  Id. ¶¶ 11, 12.  Smokehouse CEO Tim Brown ("Brown") rejected this offer and instead proposed a two-year agreement. Id. ¶ 13.  Vincent De La Cruz ("De La Cruz"), an AquaChile representative, in turn rejected Smokehouse's offer, stating he would get fired for accepting a two-year supply agreement on AquaChile's behalf.  Id. ¶ 14; Decl. of Michael Weiss in Supp. of MSJ ("Weiss Decl.") Ex. 11, ECF No. 130-11.

The parties agree that from 2016 through September 2019, AquaChile continued to provide weekly sales to Smokehouse.  Id. ¶ 22.  The parties also agree that Smokehouse was free to purchase salmon from other suppliers at any time.  Id. ¶ 25.  However, Plaintiffs assert that AquaChile's continued supply was pursuant to a three-year supply agreement that the parties entered into on July 20, 2017 (the "2017 Agreement"), which obligated AquaChile to supply Smokehouse with salmon fillets through July 2020.[2]  Id.  Defendants dispute the existence of this contract, asserting that AquaChile did

---

[2] Plaintiffs assert the following facts as to the formation of the 2017 Agreement:  Representatives of Smokehouse and AquaChile (including De La Cruz and Brown) met on July 20, 2017. Id. ¶ 97.  De La Cruz brought with him a three-year supply agreement dated July 3, 2017, and he gave it to Brown to sign. Id. ¶ 98.  After Brown signed the agreement, De La Cruz elected not to sign the agreement but "said he wanted to bring it back with him for a double check."  Id. ¶ 100.  Over the next month, Brown followed up about obtaining a countersigned copy of the agreement but did not receive one.  Id. ¶ 102.

not agree to supply Smokehouse with salmon fillets for three years.  Defs.' SUF ¶ 20.

In early 2019, AquaChile started to reduce supply of fillets to Smokehouse.  Id. ¶ 28.  Plaintiffs assert that Smokehouse began experiencing poor customer service from AquaChile, that AquaChile ignored several purchase orders Smokehouse had placed, and that there were delays in shipments.  Id. ¶ 29.  Plaintiffs believed that the supply issues were due to Agrosuper's recent acquisition of Empresas because there had previously been a lawsuit between Smokehouse and Agrosuper.  Id. ¶ 27.  On April 11, 2019, AquaChile's sales director told Brown that AquaChile was terminating its relationship with Smokehouse at Agrosuper's direction and would not continue shipping any salmon to Smokehouse due to its prior lawsuit with Agrosuper.  Id. ¶ 30.  However, Plaintiffs assert that De La Cruz called Smokehouse personnel the following morning explaining that there had been a miscommunication and that AquaChile would, in fact, continue to supply Smokehouse.  Pls.' Resp. to Defs.' SUF ¶¶ 142-43.

For the next two months, there was a significant cutback in salmon offered by AquaChile to Smokehouse. Defs.' SUF ¶ 32.  In response, Smokehouse informed AquaChile that its insufficient supply was impacting Smokehouse and that Smokehouse therefore refused to pay invoices owed to AquaChile for fillets Smokehouse had received from AquaChile.  Id. ¶¶ 34, 35.  To diffuse

tensions between the two parties, Smokehouse and AquaChile entered into an agreement on June 6, 2019 (the "2019 Agreement"), whereby AquaChile agreed to deliver six containers of fillets at a reduced price due to shipping delays, and in exchange Smokehouse agreed to pay three outstanding invoices totaling $404,078.23. Id. ¶ 36.  The 2019 Agreement also stated that Smokehouse "incurred $150k damages for . . . delayed / non-shipped containers as referenced in the agreement dated July 3, 2017 [and] quality control issues as discussed on June 30, 2019."  Pls.' Resp. to Defs.' SUF ¶ 173; Decl. of David A. Thomas in Supp. of Opp'n to MSJ ("Thomas Decl.") Ex. 35, ECF No. 153-37.

Shortly thereafter, AquaChile stopped supplying Smokehouse with frozen salmon fillets altogether, and on July 30, 2019, Smokehouse personnel discussed the need to place orders with other suppliers so there was not a gap in supply.  Defs.' SUF ¶ 45.  On August 5, 2019, AquaChile further advised Smokehouse that it would not be able to continue supplying Smokehouse with washed salmon fillets.[3]  Defs.' Suf ¶ 46.  In September 2019, AquaChile stopped accepting any new orders and completely cut off its supply to Smokehouse.  Id. ¶ 49.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[3] "Washing" is a process designed to kill Lm, a dangerous species of bacteria that is known to exist in salmon products. See Pls.' Resp. to Defs.' SUF ¶¶ 87, 95.

Id. ¶ 41.

Id. ¶¶ 42-43.

Id. ¶ 44.   Smokehouse had a "record"
year in 2019,

Id. ¶ 50; Pls.' Resp. to Defs.' SUF ¶ 50.

Defs.' SUF ¶ 52.   At the same time that AquaChile began
decreasing its supply to Smokehouse, Plaintiffs began
the process of selling Smokehouse.   Pls.'s Resp. to
Defs.' SUF ¶ 156.

Id. ¶¶ 193, 197.

Id. ¶ 277; Decl. of Jeremy Roberts

in Supp. of Pls.' Opp'n to MSJ ("Roberts Decl.") Ex. 15, ECF No. 153-93. ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████ Pls.' Resp. to Defs.' SUF ¶¶ 278-82; Roberts. Decl. Ex. 16, ECF No. 150-22.

**B.  Procedural Background**

Plaintiffs commenced this Action [1] December 19, 2019, alleging that AquaChile's breach of the 2017 Agreement, along with Defendants' other misconduct, caused Plaintiffs' deal with Labeyrie to fall through and an ultimate loss in Smokehouse's value.  On July 7, 2020, this Court granted in part and denied in part [61] Empresas and Agrosuper's Motion to Dismiss and granted [62] AquaChile's Motion to Dismiss with leave to amend. Plaintiffs filed a First Amended Complaint [66] on August 20, 2020.  Defendants answered [73] on September 23, 2020, asserting their own counterclaims against Plaintiffs for breach of contract and promissory estoppel.

Defendants filed the instant Motion [129] on January 18, 2022.  Plaintiffs filed their Opposition [153] on February 1, 2022, and Defendants replied [163] on February 8, 2022.  On February 11, 2022, this Court granted [175] Plaintiffs' Ex Parte Application to file a sur-reply to address arguments raised in Defendants' Reply regarding the economic loss doctrine.  Plaintiffs filed their Sur-Reply [189] on February 18, 2022.

# II.   DISCUSSION

## A.   **Legal Standard**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it might affect the outcome of the suit, and the dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S 242, 248 (1986).

The moving party bears the initial burden of proving the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof at trial, the moving party need only show "an absence of evidence to support the nonmoving party's case." Id. at 325.  If the moving party meets its burden, the burden then shifts to the nonmoving party to present "specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S at 250.  The nonmoving party "must show more than the mere existence of a scintilla of evidence . . . or some 'metaphysical doubt' as to the material facts at issue." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

The evidence, and all reasonable inferences based on underlying facts, must be construed in the light most favorable to the nonmoving party. Scott v. Harris, 550

U.S. 372, 378 (2007).  In reviewing the record, the court's function is not to weigh the evidence but only to determine if a genuine issue of material fact exists. Anderson, 477 U.S. at 255.  "A district court's ruling on a motion for summary judgment may only be based on admissible evidence."  In re Oracle Corp. Sec. Litig., 627 F.3d at 385.  "While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence."  Norse v. City of Santa Cruz, 629 F.3d 966, 973 (9th Cir. 2010).

**B.  Analysis**

    1.  Evidentiary Objections

    Defendants lodged a total of twenty-four objections to various evidence submitted in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. See generally Defs.' Objs. & Mot. to Strike Evid. in Opp'n to Defs.' MSJ, ECF No. 162-2.  The majority of these objections refer to evidence the Court does not rely upon in considering Defendants' Motion for Summary Judgment.  Accordingly, any objections pertaining to evidence upon which the Court does not rely are **OVERRULED.**  See Carillo v. Schneider Logistics Trans-Loading & Distrib., Inc., No. 2:11-cv-8557-CAS(DTBx), 2014 WL 172516, at *3 (C.D. Cal. Jan. 14, 2014).  To the extent the Court relies on any objected-to evidence, the Court has considered the admissibility of the evidence

1   and has not relied on any facts that are irrelevant or

2   that could not be produced in an admissible form at

3   trial.  Objections to any evidence the Court has relied

4   upon are therefore **OVERRULED**.

5       2.  The Motion

6         i.  Breach of Contract

7       Defendants argue that Smokehouse's breach of

8   contract claim fails as a matter of law because the

9   unsigned 2017 Agreement does not satisfy the statute of

10  frauds.  Mot. 14:1-3.  The Court agrees.

11      Under California's statute of frauds, a contract

12  that by its terms is not to be performed within a year

13  of its making is invalid unless there is a written

14  record or memorandum acknowledging the agreement that is

15  signed by the party to be charged.  Cal. Civ. Code. §

16  1624(a)(1).  "A memorandum satisfies the statute of

17  frauds if it identifies the subject of the parties'

18  agreement, shows that they made a contract, and states

19  the essential terms with reasonable certainty."

20  Sterling v. Taylor, 152 P.3d 420, 425 (Cal. 2007).

21  "What is essential depends on the agreement and its

22  context and also on the subsequent conduct of the

23  parties."  Id. (citing Restatement (Second) of Contracts

24  § 131 (Am. L. Inst. 1981)).  Because the memorandum

25  serves an evidentiary purpose, the memorandum itself

26  must contain those essential terms; extrinsic evidence

27  cannot be used to supply required terms that are missing

28  from the memorandum.  Id. at 425-26.  It is a question

of law whether a memorandum complies with the statute of frauds, so "the issue is generally amenable to resolution by summary judgment." Id. at 429.

Here, Plaintiffs' breach of contract claim rests on the enforceability of the 2017 Agreement, which they assert was a three-year supply agreement that obligated AquaChile to supply Smokehouse with salmon fillets through July 2020. See FAC ¶¶ 90-95, ECF No. 66. It is undisputed that the 2017 Agreement was never signed by any AquaChile representative. See Pls.' Resp. to Defs.' SUF ¶ 19. However, Plaintiffs argue that the memorandum exception to the statute of frauds applies because the 2019 Agreement references the existence of the 2017 Agreement. See Pls.' Opp'n to Defs.' MSJ ("Opp'n") 14:1-11, ECF No. 150-3.

The 2019 Agreement is insufficient to satisfy the memorandum exception to statute of frauds as a matter of law. The duration of AquaChile's supply obligation is an essential term of the purported 2017 Agreement. The parties had formerly disagreed over duration, and the very purpose of the purported 2017 Agreement was to give Smokehouse assurance that AquaChile would continue supplying it for a certain period of time. The 2019 Agreement, however, makes no reference whatsoever to any duration term governing the 2017 Agreement. See Thomas Decl. Ex. 35. Even if the Court were to consider extrinsic evidence of a three-year term, nothing in the record supports the existence of such a term. To the

contrary, the record shows that De La Cruz had refused a two-year supply agreement less than a month before the parties purportedly entered into the 2017 Agreement. See Defs.' SUF ¶¶ 14-17.[4]

Plaintiffs additionally argue that "AquaChile is estopped to assert the statute of frauds due to its partial performance, [Smokehouse's] reliance thereon, and the unconscionability of finding it unenforceable." Opp'n 14:12-14.  The Court disagrees.

"[W]here assertion of the statute of frauds would cause unconscionable injury, part performance allows specific enforcement of a contract that lacks the requisite writing."  In re Marriage of Benson, 116 P.3d 1152, 1159 (Cal. 2005).  However, "to constitute part performance, the relevant acts must either

_____

[4] Plaintiffs also argue that representatives of each Defendant admitted during depositions that the 2019 Agreement referenced the 2017 Agreement.  Opp'n 14:9-11.  These oral statements do not amount to judicial admissions that AquaChile agreed to be bound by a supply agreement for three years.  For a judicial admission to overcome the statute of frauds, the admission of the contract's existence must be "unqualified or unconditional."  Am. Induction Techs., Inc. v. KBK, Inc., No. SA CV11-00350 JAK (RNBx), 2012 WL 12888105, at *6 (C.D. Cal. April 20, 2012).

t

atements are equivocal at best and cannot be considered judicial admissions of a three-year supply agreement.

'unequivocally refer' to the contract or 'clearly relate' to its terms." Id. at 1160 (citations omitted). "Unconscionable injury results from denying enforcement of a contract after one party is induced by another party to seriously change position relying upon the oral agreement" or where there is unjust enrichment. Allied Grape Growers v. Bronco Wine Co., 249 Cal. Rptr. 872, 878 (Cal. Ct. App. 1988).

Here, AquaChile's conduct in supplying Smokehouse with salmon fillets through September 2019 does not unequivocally refer or relate to the purported three-year term of the 2017 Agreement.  This evidence shows nothing more than that Smokehouse had been placing orders with AquaChile and AquaChile had been filling them; Plaintiffs point to no performance by Defendants indicating that they were required to do so for a three-year term.  Similarly, that the 2019 Agreement required AquaChile to pay Smokehouse $150,000 for delays "referenced" in the 2017 Agreement does not clearly relate to a three-year term.  In short, AquaChile's conduct in supplying salmon fillets to Smokehouse and paying for delays does not create a genuine issue of fact as to whether AquaChile was under an obligation to supply for a term of three years.  AquaChile's conduct therefore fails to affirm the purported terms of the 2017 Agreement. See Sutton v. Warner, 15 Cal. Rptr. 2d 632, 637 (Cal. Ct. App. 1993) (stating that a primary consideration in applying the part performance exception

is "the extent to which the evidentiary function of the statutory formalities of the statute of frauds is fulfilled by the conduct of the parties").

The part performance exception is also inapplicable because Smokehouse would not suffer an unconscionable injury if the 2017 Agreement were not enforced.  It is undisputed that Plaintiffs did not suffer any material loss in earnings due to AquaChile's supply stoppage.  See Pls.' Resp. to Defs.' SUF ¶¶ 50-51.  And even if AquaChile's supply stoppage prevented Smokehouse from closing the deal with Labeyrie, ███████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████  See Roberts Decl. Ex. 15.  Because AquaChile's supply stoppage did not cause Smokehouse any loss in earnings and did not prevent Plaintiffs from pursuing the sale of Smokehouse to other buyers ████████ ██████████████████████, Smokehouse would not suffer an unconscionable injury if the contract were deemed unenforceable.  Further, AquaChile would not be unjustly enriched if the 2017 Agreement were not enforced because AquaChile held up its end of each bargain by supplying Smokehouse with salmon fillets to fill the orders that Smokehouse had paid for.  See Pls.' Resp. to Defs.' SUF ¶¶ 79-82.

The evidence also reveals that Smokehouse did not seriously change its position in reliance upon AquaChile's purported representations that it would

continue to supply Smokehouse with salmon for three

years.  See Allied Grape, 249 Cal. Rptr. at 878.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ Pls.' Resp. to Defs.' SUF ¶¶ 42-43. ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Id. ¶ 44.  This

transition shows that Smokehouse was not fully dependent

on AquaChile to supply it with fillets, and the impact

of the supply stoppage on Smokehouse was minimal.  Cf.

Allied Grape, 249 Cal. Rptr. at 879 (finding

unconscionable injury where plaintiff changed its

position with another buyer in reliance on defendant's

assurances and defendant rejected the goods after it was

too late for plaintiff to resell them).

In sum, there is simply no written memorandum or

conduct by the parties that overcomes the statute of

frauds defense here.  "The writing requirement is

intended to permit the enforcement of agreements

actually reached, but 'to prevent enforcement through

fraud or perjury of contracts never in fact made.'"

Sterling, 152 P.3d at 431 (quoting Restatement (Second)

of Contracts § 131 (Am. L. Inst. 1981)).  The evidence

here fails as a matter of law to establish with

reasonable certainty that the parties entered into a

supply agreement with a three-year term.

Accordingly, the Court concludes that the 2017 Agreement is unenforceable under the statute of frauds because it is not signed by any representative of Defendants and no exception to the statute of frauds applies. Because Plaintiffs' first claim is for breach of this unenforceable agreement, the Court **GRANTS** Defendants' Motion as to Plaintiffs' first claim for relief.

Plaintiffs' seventh claim, for inducing breach of contract, and eighth claim, for intentional interference with contractual relations, also depend on the enforceability of the 2017 Agreement. See FAC ¶¶ 124-137; see Sebastian Int'l, Inc. v. Russolillo, 162 F. Supp. 2d 1198, 1203 (C.D. Cal. 2001). Because the Agreement is unenforceable under the statute of frauds, these claims must also fail as a matter of law. Accordingly, the Court **GRANTS** Defendant's Motion as to Plaintiffs' seventh and eighth claims for relief.

ii. Promissory Estoppel

Plaintiffs alternatively seek recovery under a promissory estoppel theory. See FAC ¶ 97. Plaintiffs assert that AquaChile promised to supply Smokehouse with salmon fillets "in accordance with the terms of the [2017 Agreement] and the parties' prior dealings." Id. ¶ 98.

Promissory estoppel is intended to "make a promise binding, under certain circumstances, without consideration in the usual sense of something bargained

for and given in exchange." Youngman v. Nev. Irrigation Dist., 449 P.2d 462, 468 (Cal. 1969). If, however, there was a bargained-for exchange such that a promise is supported by consideration, the doctrine of promissory estoppel is inapplicable. Id.; Walker v. KFC Corp., 728 F.2d 1215, 1220 (9th Cir. 1984) (quotation marks and citations omitted) ("[T]he promissory estoppel doctrine is limited to cases where no benefit flows to the promisor.").

Here, Smokehouse alleges that it detrimentally relied on AquaChile's promises that it would continue to supply Smokehouse with salmon fillets through July 2020. FAC ¶ 98. However, it is undisputed that Smokehouse agreed to pay AquaChile for each order of fillets that AquaChile supplied. Pls.' Resp. to Defs.' SUF ¶ 22. AquaChile's purported promise was therefore part of a bargained-for exchange that was supported by consideration. Accordingly, promissory estoppel is inapplicable here. See Boon Rawd Trading Int'l Co. v. Paleewong Trading Co., 688 F. Supp. 2d 940, 953-54 (N.D. Cal. 2010) (holding that promissory estoppel was inapplicable where defendant's promises "were bargained for and given in exchange for performance"); Patriot Scientific Corp. v. Korodi, 504 F. Supp. 2d 952, 969 (S.D. Cal. 2007) (same). In other words, Plaintiffs may not use the doctrine of promissory estoppel to circumvent the statute of frauds and recover under an unenforceable contract. "Promissory estoppel is not a

doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove a breach of contract."  Walker, 728 F.2d at 1220.  Accordingly, the Court **GRANTS** Defendants' Motion as to Plaintiffs' second claim for relief.

iii.   Fraudulent Concealment

A.   Smokehouse's Claim

1.Economic Loss Doctrine

"The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." Robinson Helicopter Co., v. Dana Corp., 102 P.3d 268, 272 (Cal. 2004) (citation omitted).  Thus, in an effort to "prevent the law of contract and the law of tort from dissolving one into the other," the economic loss rule bars tort claims that seek recovery for purely economic loss that is indistinguishable from the loss caused by breach itself.  Id. at 273 (quoting Rich Prods. Corp. v. Kemutec, Inc., 66 F. Supp. 2d 937, 969 (E.D. Wis. 1999).

Despite this rule, courts have allowed recovery for a "tortious breach of contract" where the breach is accompanied by fraudulent conduct that is separate from the breach itself and causes damage to the plaintiff beyond that contemplated by the contract.  Id. at 273, 276.  Where the fraud is rooted solely in misrepresentations as to the defendant's performance

under the terms of the contract, however, courts have
held that the economic loss rule bars the tort claim.
See UMG Recordings, Inc. v. Global Eagle Ent., Inc., 117
F. Supp. 3d 1092, 1104-05 (C.D. Cal. 2015) (dismissing a
fraudulent concealment claim as barred by the economic
loss rule where the allegedly fraudulent statements
related to defendant's intent to make good on his
contractual promises).

Here, Plaintiffs assert that Defendants are liable
in fraud because they failed to disclose to Smokehouse
that they "had decided to terminate the [2017 Agreement]
and cut off all supply . . . well before the earliest
end of the three-year term in the agreement."  See FAC ¶
76(a); see also Opp'n 22:23-26 ("Defendants are liable
to Plaintiffs because they made a *past* decision . . . to
cut off all supply to [Smokehouse] in the near future
despite the [2017 Agreement] and then misled Plaintiffs
into believing supply would continue.").  This claim
seeks recovery of solely economic loss and is not
independent from the purported contract between
Smokehouse and AquaChile.  Plaintiff's fraudulent
concealment claim is therefore barred by the economic
loss doctrine.

Alexsam Inc. v. Green Dot Corp., No. 2:15-cv-05742-
CAS (PLAx), 2017 WL 2468769 (C.D. Cal. June 5, 2017), is
instructive.  There, plaintiff sued defendant for breach
of contract and intentional misrepresentation, among
other things.  Id. at *1.  Plaintiff alleged that

defendant breached the parties' licensing agreement by failing to pay plaintiff royalties.  Id. at *2. Plaintiff further alleged that when it sent a letter to defendant asking whether defendant owed royalties to plaintiff for its sale of certain products, defendant intentionally misrepresented that no royalties were owed in order to avoid paying them.  Id. at *3.  The court determined that the intentional misrepresentation claim was barred by the economic loss doctrine because defendants "alleged fraud is directly related to its alleged breach" of the licensing agreement and the parties' dispute was "fundamentally contractual in nature."  Id. at *6.  Further, the court reasoned that plaintiff did not allege damages resulting from the fraud "aside from economic losses resulting from breach" of the licensing agreement.  Id.

Smokehouse's fraud claim here fails for similar reasons.  Plaintiffs seek to hold Defendants liable for their repeated affirmations that they would continue to supply Smokehouse with salmon fillets pursuant to the 2017 Agreement.  Plaintiffs pinpoint Defendants' fraudulent conduct as their failure to disclose their intention to breach that agreement early.[5]  See Opp'n

---

[5] In their sur-reply, Plaintiffs attempt to recharacterize their fraud claim as one of fraudulent inducement by asserting that the fraud claim is based on "Defendants' fraudulent inducement of Plaintiffs to enter into two sets of contracts": (1) the 2019 Agreement; and (2) subsequent purchases of salmon from AquaChile until the supply cutoff.  See Pls.' Sur-Reply in Opp'n to Defs.' MSJ ("Sur-Reply") 1:5-9, ECF No. 189.  This fraud theory is not only inconsistent with Plaintiffs' prior papers but

22:23-27.  Because the specified misrepresentations are tied directly to Defendants' performance under the 2017 Agreement, the dispute is fundamentally contractual in nature.  Plaintiffs are barred from transforming that contractual dispute into a tort claim because any losses Plaintiffs suffered from Defendants' misrepresentations should have been anticipated by Plaintiffs and accounted for when the parties purportedly negotiated the 2017 Agreement.[6]  See Chaffey Joint Union High School Dist. V. FieldTurf USA, Inc., No. EDCV 16-204-JGB-DTBx, 2016 WL 11499348, at *4 (C.D. Cal. April 28, 2016)

is also unpersuasive.  The representations that Plaintiffs identify as fraudulent relate to Defendants' continued supply of salmon through July 2020.  See Sur-Reply 1:19-21.  Neither the 2019 Agreement nor the subsequent purchases Plaintiffs refer to relate in any way to Defendants' purported obligation to continue supply.  To the extent Plaintiffs argue that they relied on Defendants' statements about continued supply in entering these agreements, that reliance is therefore unreasonable as a matter of law.  Moreover, Plaintiffs have failed to create a triable issue of fact as to any loss they suffered by entering into either the 2019 Agreement or the subsequent purchases, as they do not dispute that Defendants held up their end of the bargain in each instance.

[6] The Court's conclusion that the 2017 Agreement is unenforceable does not change the application of the economic loss rule.  See Soil Retention Prods., Inc. v. Brentwood Indus., Inc., 521 F. Supp. 3d 929 (S.D. Cal. 2021) (dismissing breach of contract claim for failure to sufficiently allege the existence of a contract, and then dismissing fraud claims related to that alleged contract as barred by the economic loss rule).  Applying the rule here serves its policy of preventing "the law of contract and the law of tort from dissolving one into the other." Robinson Helicopter, 102 P.2d at 273 (citations omitted). Smokehouse seeks to recover for the same economic losses here as it does in its breach of contract claim, and it cannot circumvent the flaws of that claim by recasting it as fraud without also showing some "clear . . . deviation from socially useful business practices" in support.  Id. at 275 (citations omitted).

(dismissing misrepresentation claim because the "representations [fell] squarely within the warranties of the contracts").  Indeed, as in <u>Alexsam</u>, Plaintiffs seek identical recovery for both the breach of contract and the fraud claims.  Because the economic loss rule bars Plaintiffs' fraudulent concealment claims, the Court **GRANTS** Defendants' Motion as to Smokehouse's third claim for relief.

2. Duty to Disclose

To the extent Smokehouse is alleging that Defendants are liable for fraud based on their misrepresentations that supply would continue independent of the contract, the Court finds that this claim must fail because Defendants did not have a duty to disclose their supply cutoff to Smokehouse.

"The elements of fraudulent concealment are: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a *duty* to disclose the fact to the plaintiff; (3) the defendant *intentionally* concealed or suppressed the fact with the intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact; and (5) as a result of the concealment or suppression of the fact, the plaintiff sustained damage."  <u>Immobiliare, LLC v. Westcor Land Title Ins. Co.</u>, 424 F. Supp. 3d 882, 888 (E.D. Cal. 2019) (quoting <u>Burch v. CertainTeed Corp.</u>, 246 Cal. Rptr. 3d 99, 106 (Cal. Ct. App. 2019)).  A duty

to disclose arises: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." Id.  In the latter three circumstances, some sort of transactional relationship between the parties is also required that would give rise to the need for full disclosure of facts material to that agreement.  Id. at 889.

Here, Defendants were not under a duty to disclose AquaChile's decision to stop supplying Smokehouse because there was not a sufficient transactional relationship between the parties.  Given that the 2017 Agreement is unenforceable, all that existed between AquaChile and Smokehouse was an informal supply arrangement that both parties were free to terminate at any time.  While each order placed by Smokehouse and fulfilled by AquaChile constituted a transactional relationship, those distinct transactions did not include a promise that any new transactions would take place.  Because there was no existing agreement between the parties that obligated Defendants to notify Smokehouse that it would no longer accept orders from them, Defendants cannot be liable in fraud for failing to disclose that fact to Smokehouse.

Plaintiffs argue that Defendants had a duty to

1  disclose their June 2019 decision to stop supplying

2  Smokehouse because they made "misleading statements" and

3  "half-truths designed to conceal the cutoff decision"

4  and because they actively concealed the cutoff decision

5  from Plaintiffs.  Opp'n 21:21-27.  Plaintiffs point to

6  two emails sent from De La Cruz to Brown where AquaChile

7  purportedly made material misrepresentations.  Id.  The

8  first responded to Smokehouse's concern in not receiving

9  an offer to purchase more fillets for the week, which

10  stated: "I will call them to make sure they offer you

11  volumes every week."  See Thomas Decl. Ex. 27, ECF No.

12  153-29.  The second responded to Smokehouse's inquiry

13  about a shipment from Defendants that was short on

14  expected quantity, which stated: "We [w]ill make it [up]

15  in the next ones, or through fresh [fillets] if needed."

16  See Decl. of Timothy Brown in Supp. of Opp'n ("Brown

17  Decl.") Ex 1, ECF No. 153-77.

18      These statements, read in the light most favorable

19  to Plaintiffs, are not likely to mislead a reasonable

20  person into believing that AquaChile would continue

21  supplying Smokehouse for any certain period of time.

22  While De La Cruz promised to offer Smokehouse volumes of

23  salmon "every week," no reasonable businessperson would

24  read that statement so literally as to require a

25  qualification that the supply would not continue

26  forever.  Similarly, De La Cruz's promise to make up for

27  a short supply in subsequent orders is not a promise to

28  supply orders indefinitely.  In the absence of an

enforceable agreement to continue supply, these two statements are not likely to mislead a reasonable purchaser into believing that the supplier is obligating itself to continue the supply for a certain period of time.  To find that such statements either bind AquaChile to continue supply indefinitely or make AquaChile liable for fraud would discourage healthy communication between businesses and would create needless litigation any time an informal supply arrangement fell through.  Because the Court finds the 2017 Agreement to be unenforceable for the reasons stated above, the Court declines to hold that Defendants were under a duty to disclose their intent to stop supplying Smokehouse in the near future.

Plaintiffs alternatively argue that Defendants were under a duty to disclose their intent to cut off supply because they "prevented Plaintiffs from discovering the cutoff decision by reassuring [Smokehouse] about supply."  Opp'n 21:27-28.  The record, however, indicates otherwise.  When Defendants had to cut back their supply by no longer providing fresh salmon to Smokehouse, De La Cruz clearly communicated as much.  See Thomas Decl. Ex. 22, ECF No. 153-24.  And Plaintiffs themselves acknowledge that from June through September 2019, "the amount of salmon AquaChile was offering remained on the lower side."  See Pls.' Resp. to Defs.' SUF ¶ 235.  While Defendants may not have told Plaintiffs about their supply cutoff decision as soon as

they formed their intent to cut off supply, Defendants were under no duty to do so.  Defendants' failure to inform Plaintiffs of this decision from June until September 2019 therefore cannot amount to fraud. Accordingly, the Court **GRANTS** Defendants' Motion as to Smokehouse's claim for fraudulent concealment.

####    B.   DHBrands' Claim

Because DHBrands' fraudulent concealment claim is based on the same purported misrepresentations as those underpinning Smokehouse's claim, the economic loss rule should apply equally to bar DHBrands' claim.  While DHBrands itself was not in privity of contract with AquaChile, the misrepresentations presented are nonetheless rooted in AquaChile's promises to perform duties under the purported contract.  The policies behind the economic loss doctrine therefore apply with equal force to DHBrands' claim as to Smokehouse's claim. See Agricola Cuyuma SA v. Corona Seeds, Inc., No. CV 17-8220-DMG (SKx), 2021 WL 3930054 (C.D. Cal. June 25, 2021) (applying the economic loss rule in the absence of contractual privity because it furthered the policy goal of requiring an agreement to sue under to recover for purely economic loss).

DHBrands' claim similarly fails because Defendants did not owe DHBrands a duty to disclose their intent to cut off their supply to Smokehouse.  DHBrands' claim relies on the same statements and arguments as Smokehouse's claim, and the arguments related to duty

therefore fail for the reasons stated above.
Accordingly, the Court **GRANTS** Defendants' Motion as to
DHBrands' claim for fraudulent concealment.

### C.   Aiding and Abetting

Plaintiffs assert a claim for aiding and abetting
fraudulent concealment against Agrosuper, arguing that
Agrosuper aided the fraudulent conduct of AquaChile and
Empresas in concealing the supply cutoff decision.  See
FAC ¶¶ 110-112.  "[L]iability under an aiding and
abetting theory 'is dependent upon the commission of an
underlying tort.'"  Harrison v. Downey Savings & Loan
Ass'n, F.A., No. 09-CV-1391 H(BLM), 2009 WL 2524526, at
*6 (S.D. Cal. Aug. 14, 2009) (quoting Richard B. LeVine,
Inc. v. Higashi, 32 Cal. Rptr. 3d 244, 249 (Cal. Ct.
App. 2005)). Because Plaintiffs' underlying fraudulent
concealment claims fail, their claim for aiding and
abetting fraudulent concealment also fails.  The Court
therefore **GRANTS** Defendants' Motion as to Plaintiffs'
fourth claim for relief.

### iv.   Intentional and Negligent Interference with
### Prospective Economic Advantage

Interference with prospective economic advantage
requires, among other things, "intentional [or
negligent] acts on the part of the defendant designed to
disrupt the relationship." Korea Supply Co. v. Lockheed
Martin Corp., 63 P.3d 937, 950 (Cal. 2003) (citation
omitted).  As part of this element, a plaintiff must
also prove that the defendant's acts were wrongful apart

1  from the interference itself.  Id.

2      Plaintiffs argue that Defendants interfered with

3  the prospective economic advantage Plaintiffs were to

4  receive from their deal with Labeyrie by cutting off the

5  supply of salmon to Smokehouse.  See FAC ¶¶ 113-123,

6  138-147.  To establish that Defendants' interfering

7  actions were wrongful, Plaintiffs rely on Defendants'

8  "ongoing pattern" of fraudulently concealing their

9  decision to cut off supply in violation of the 2017

10  Agreement.  See Opp'n 18:11-17.  As explained above,

11  however, there was nothing fraudulent about Defendants'

12  failure to inform Plaintiffs of their decision to cut

13  off supply before September 2019.  Because Plaintiffs

14  offer no alternative basis for finding that Defendants'

15  conduct was wrongful, Plaintiffs fail to establish the

16  third element of their interference claims.  The Court

17  therefore **GRANTS** Defendants' Motion as to Plaintiffs'

18  fifth, sixth, ninth, and tenth claims for relief.

19      v.  Defendants' Counterclaims

20      AquaChile seeks summary judgment against Smokehouse

21  in the amount of $556,519.32 for orders that AquaChile

22  filled but for which Smokehouse refuses to pay.  See

23  Mot. 25:14-19.  Smokehouse does not dispute that it

24  received these orders, nor that it was able to earn a

25  profit of over $100,000 from reselling these fillets to

26  its customers.  See Pls.' Resp. to Defs.' SUF ¶¶ 79-82.

27  Rather, Smokehouse argues that AquaChile fraudulently

28  altered its "washing" process without informing

1   Smokehouse, which is a complete defense to AquaChile's

2   claim.  See Opp'n 25:10-22.

3       Fraud is a well-established defense to a breach of

4   contract claim that may serve as a complete bar to the

5   claimant's recovery.  TSI USA LLC v. Uber Techs., Inc.,

6   No. 17-cv-03536-HSG, 2020 WL 5257873, at *8 (N.D. Cal.

7   Sept. 3, 2020).  "In California, the elements of fraud

8   are: (1) misrepresentation; (2) knowledge of falsity;

9   (3) intent to defraud or to induce reliance (4)

10  justifiable reliance; and (5) resulting damage."  Id.

11  (citing Odorizzi v. Bloomfield Sch. Dist., 246 Cal. App.

12  2d 123, 129 (Cal. Ct. App. 1966).

13      Several issues thwart Smokehouse's affirmative

14  defense.  First, Smokehouse has failed to provide

15  evidence of an affirmative representation made by

16  AquaChile that the fillets included in the relevant

17  purchase order were washed.  To the contrary, Smokehouse

18  admits that AquaChile communicated its inability to

19  continue supplying washed fillets on April 26, 2019, and

20  again on August 5, 2019.  See Pls.' Resp. to Defs.' SUF

21  ¶¶ 145, 229.  Because all of the invoices for the orders

22  at issue are dated after these communications, any

23  reliance on a statement to the contrary was unreasonable

24  as a matter of law.  See Weiss Decl. Ex. 55, ECF No.

25  130-55.  Finally, even if such a misrepresentation

26  existed, Smokehouse has failed to raise a triable issue

27  of fact as to damage resulting from the fraud.

28  Plaintiff does not dispute that it was able to sell the

1  relevant fillets at a profit and does not otherwise
2  assert any losses occurred as a result of AquaChile's
3  purported misrepresentation.  See Pls.' Resp. to Defs.'
4  SUF ¶ 82.

5      In sum, it is undisputed that Smokehouse received
6  $556,519.32 worth of salmon and has refused to pay
7  AquaChile despite the existence of valid agreements.
8  See Weiss Decl. Ex. 55, ECF No. 130-55.  Smokehouse has
9  failed to raise a triable issue of fact as to its
10  affirmative defense for fraud.  The Court therefore
11  **GRANTS** Defendants' Motion as to AquaChile's first and
12  second counterclaims for breach of contract and award
13  AquaChile $556,519.32 on its breach of contract claim.
14  Because AquaChile pleaded its third counterclaim for
15  promissory estoppel as an alternative to its second
16  claim for relief, AquaChile's third counterclaim is
17  therefore moot.

18             **III.   CONCLUSION**

19      Based on the foregoing, the Court **GRANTS**
20  Defendants' Motion for Summary Judgment.  The Court
21  enters judgment in favor of Defendants and against
22  Plaintiffs on all ten of Plaintiffs' claims for relief.
23  The Court also rules in favor of AquaChile on its first
24  and second counterclaims for breach of contract and
25  enters judgment against Smokehouse in the amount of
26  $556,519.32.  The Court dismisses AquaChile's third
27  counterclaim for promissory estoppel as moot.
28      Given the Court's ruling on the Motion for Summary

1  Judgment, the Court **DENIES** Defendants' Motions in Limine

2  and its Motion to Exclude **as moot.**

3       **IT IS SO ORDERED.**

4

5  DATED: March 4, 2022              /s/ Ronald S.W. Lew

6                              **HONORABLE RONALD S.W. LEW**
                               Senior U.S. District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28