'O'

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE SANTA BARBARA SMOKEHOUSE, INC., a California corporation; and DHBRANDS LIMITED, a Cyprus limited liability company,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>AQUACHILE, INC., a Florida corporation; AGROSUPER S.A., a Chile corporation; and EMPRESAS AQUACHILE S.A., a Chile corporation,<br><br>　　　　Defendants. | CV 19-10733-RSWL-JEMx<br><br>**ORDER re: Plaintiffs' Motion for Reconsideration** [272] and **AquaChile's Motion to Amend Judgment to Add Prejudgment and Post-Judgment Interest** [273] |
| AQUACHILE, INC., a Florida corporation,<br><br>　　Counter-Plaintiff,<br><br>　　v.<br><br>THE SANTA BARBARA SMOKEHOUSE, INC., a California corporation,<br><br>　　Counter-Defendant. | |

1    Plaintiffs The Santa Barbara Smokehouse
2    ("Smokehouse") and DHBrands Limited ("DHBrands") brought
3    this Action, asserting various contract and fraud-
4    related claims against Defendants AquaChile, Inc.
5    ("AquaChile"); Agrosuper S.A. ("Agrosuper"); and
6    Empresas AquaChile S.A. ("Empresas") (collectively,
7    "Defendants").  On March 4, 2022, the Court granted
8    Defendants' Motion for Summary Judgment in its entirety,
9    and on March 7, 2022, the Court entered judgment in
10   favor of Defendants.
11       Currently before the Court is Plaintiffs' Motion to
12   Alter or Amend the Judgment Pursuant to Rule 59(e), or,
13   in the Alternative, for Relief from the Judgment
14   Pursuant to Rule 60(b) [272] ("Motion for
15   Reconsideration").  Also before the Court is AquaChile's
16   Motion to Amend Judgment to Add Prejudgment and Post-
17   Judgment Interest [273] ("Motion to Amend Judgment").
18   Having reviewed all papers submitted pertaining to these
19   Motions, the Court **NOW FINDS AND RULES AS FOLLOWS**: the
20   Court **DENIES** Plaintiff's Motion for Reconsideration and
21   **GRANTS** AquaChile's Motion to Amend Judgment.
22                    **I.   BACKGROUND**
23   **A.   Factual Background**
24       Smokehouse is a California corporation. Defs.'
25   Stmt. of Uncontroverted Facts ("Defs.' SUF") ¶ 1, ECF
26   No. 129-2.  DHBrands owns the brands under which
27   Smokehouse sells its salmon products, and Smokehouse
28   pays DHBrands a percentage of Smokehouse's revenues in

exchange for use of the brands. Id. ¶ 4. AquaChile is a supplier of salmon fillets and is a wholly owned subsidiary of Empresas. Id. ¶¶ 6, 8. Both AquaChile and Empresas are owned by Agrosuper. Id. ¶ 7.

In 2015, Smokehouse and AquaChile entered into a one-year supply agreement whereby AquaChile would supply Smokehouse with various salmon fillets, and Smokehouse would pay a price per pound that was negotiated monthly. Id. ¶ 9. This agreement expired in April 2016, but AquaChile continued to supply fillets to Smokehouse on a per-order basis. Id. ¶ 10. When Smokehouse later sought assurance that AquaChile would continue supplying it with salmon fillets at Smokehouse's election, AquaChile proposed a five-month supply agreement. Id. ¶¶ 11, 12. Smokehouse's CEO Tim Brown ("Brown") rejected this offer and instead proposed a two-year agreement. Id. ¶ 13. Vincent De La Cruz ("De La Cruz"), an AquaChile representative, in turn rejected Smokehouse's offer, stating he would get fired for accepting a two-year supply agreement on AquaChile's behalf. Id. ¶ 14; Decl. of Michael Weiss in Supp. of MSJ ("Weiss Decl.") Ex. 11, ECF No. 130-11.

The parties agree that from 2016 through September 2019, AquaChile continued to provide weekly sales to Smokehouse. Defs.' SUF ¶ 22. The parties also agree that Smokehouse was free to purchase salmon from other suppliers at any time. Id. ¶ 25. However, Plaintiffs assert that AquaChile's continued supply was pursuant to

3

a three-year supply agreement that the parties entered into on July 20, 2017 (the "2017 Agreement"), which obligated AquaChile to supply Smokehouse with salmon fillets through July 2020.[1] Defs.' SUF ¶ 25. Defendants dispute the existence of this contract, asserting that AquaChile did not agree to supply Smokehouse with salmon fillets for three years. Id. ¶ 20.

In early 2019, AquaChile started to reduce supply of fillets to Smokehouse. Id. ¶ 28. Plaintiffs assert that Smokehouse began experiencing poor customer service from AquaChile, that AquaChile ignored several purchase orders Smokehouse had placed, and that there were delays in shipments. Id. ¶ 29. Plaintiffs believed that the supply issues were due to Agrosuper's recent acquisition of Empresas because there had previously been a lawsuit between Smokehouse and Agrosuper. Id. ¶ 27. On April 11, 2019, AquaChile's sales director told Brown that AquaChile was terminating its relationship with Smokehouse at Agrosuper's direction and would not continue shipping any salmon to Smokehouse due to its

---

[1] Plaintiffs assert the following facts as to the formation of the 2017 Agreement: Representatives of Smokehouse and AquaChile (including De La Cruz and Brown) met on July 20, 2017. Pls.' Resp. to Defs.' SUF ¶ 97, ECF No. 150-4. De La Cruz brought with him a three-year supply agreement dated July 3, 2017, and he gave it to Brown to sign. Id. ¶ 98. After Brown signed the agreement, De La Cruz elected not to sign the agreement but "said he wanted to bring it back with him for a double check." Id. ¶ 100. Over the next month, Brown followed up about obtaining a countersigned copy of the agreement but did not receive one. Id. ¶ 102.

4

prior lawsuit with Agrosuper. Id. ¶ 30. However, Plaintiffs assert that De La Cruz called Smokehouse personnel the following morning explaining that there had been a miscommunication and that AquaChile would, in fact, continue to supply Smokehouse. Pls.' Resp. to Defs.' SUF ¶¶ 142-43.

For the next two months, there was a significant cutback in salmon offered by AquaChile to Smokehouse. Defs.' SUF ¶ 32. In response, Smokehouse informed AquaChile that its insufficient supply was impacting Smokehouse and that Smokehouse therefore refused to pay invoices owed to AquaChile for fillets Smokehouse had received from AquaChile. Id. ¶¶ 34-35. To diffuse tensions between the two parties, Smokehouse and AquaChile entered into an agreement on June 6, 2019 (the "2019 Agreement"), whereby AquaChile agreed to deliver six containers of fillets at a reduced price due to shipping delays, and in exchange Smokehouse agreed to pay three outstanding invoices totaling $404,078.23. Id. ¶ 36. The 2019 Agreement also stated that Smokehouse "incurred $150k damages for . . . delayed / non-shipped containers as referenced in the agreement dated July 3, 2017 [and] quality control issues as discussed on June 30, 2019." Pls.' Resp. to Defs.' SUF ¶ 173; Decl. of David A. Thomas in Supp. of Opp'n to MSJ ("Thomas Decl.") Ex. 35, ECF No. 153-37.

Shortly thereafter, AquaChile stopped supplying Smokehouse with frozen salmon fillets altogether, and on

July 30, 2019, Smokehouse personnel discussed the need to place orders with other suppliers so that there was not a gap in supply. Defs.' SUF ¶ 45. On August 5, 2019, AquaChile further advised Smokehouse that it would not be able to continue supplying Smokehouse with washed salmon fillets.[2] Defs.' SUF ¶ 46. In September 2019, AquaChile stopped accepting any new orders and completely cut off its supply to Smokehouse. Id. ¶ 49.

**B. Procedural Background**

On March 4, 2022, this Court granted [256] Defendants' Motion for Summary Judgment in its entirety. The Court entered Judgment [261] for Defendants and against Plaintiffs on March 7, 2022, as to all of Plaintiffs' claims and as to AquaChile's counterclaims for breach of contract. Defendants filed an Application to the Clerk to Tax Costs [266] on March 18, 2022, which remains pending.

Plaintiffs filed the instant Motion for Reconsideration [272] on April 4, 2022. Defendants opposed [280] on April 26, 2022, and Plaintiffs replied [285] on May 10, 2022.

Defendants filed the instant Motion to Amend Judgment [273] on April 4, 2022. Plaintiffs opposed [277] on April 26, 2022, and Defendants replied [282] on May 10, 2022.

---

[2] "Washing" is a process designed to kill Lm, a dangerous species of bacteria that is known to exist in salmon products. See Pls.' Resp. to Defs.' SUF ¶¶ 87, 95.

6

**II.  DISCUSSION**

**A.  Legal Standard**

    1.  Motion for Reconsideration

A motion for reconsideration can be brought under either Rule 59(e) or Rule 60(b) of the Federal Rules of Civil Procedure.  Backlund v. Barnhart, 778 F.2d 1386, 1388 (9th Cir. 1985).  Reconsideration under Rule 59(e) is appropriate "if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."  Sch. Dist. No. 1J v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993).  However, this is an "extraordinary remedy, to be used sparingly" and only in "highly unusual circumstances."  Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 877, 890 (9th Cir. 2000).

Alternatively, a party may seek relief from a final judgment due to: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud or other misconduct by an opposing party; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) any other reason justifying relief from operation of judgment.  Fed. R. Civ. P. 60(b).  Relief under this Rule for "any other reason" requires a finding of "extraordinary circumstances."  Backlund, 778 F.2d at 1388 (citation omitted).

Motions for reconsideration should not be used as a vehicle to raise "repetitive contentions of matters

which were before the court on its prior consideration or contentions which might have been raised prior to the challenged judgment." Costello v. U.S. Government, 765 F. Supp. 1003, 1009 (C.D. Cal. 1991); see also Evans Hotels, LLC v. United Here! Local 30, No. 3:18-cv-02763-LL-AHG, 2022 WL 272009, at *5 (S.D. Cal. Jan. 28, 2022) ("[M]otions for reconsideration should not be used merely as an intermediate 'appeal' before taking a disputed ruling to the Ninth Circuit.").

### 2. Prejudgment and Post-Judgment Interest

After a court has entered judgment on a claim, the prevailing party may move to amend the judgment to add an award of prejudgment and post-judgment interest. Osterneck v. Ernst & Whinney, 489 U.S. 169, 175 (1989). A post-judgment request for interest is properly brought as a motion to alter or amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure. Id.

In diversity actions, state law determines whether the prevailing party is entitled to an award of prejudgment interest. Northrop Corp. v. Triad Int'l Mktg., S.A., 842 F.2d 1154, 1155 (9th Cir. 1988). California law provides that a party "entitled to recover damages certain, or capable of being made certain by calculation," is entitled to recover interest from the date that the right to recover became vested. Cal. Civ. Code § 3287(a). Damages are uncertain, and prejudgment interest is therefore not recoverable, where "the amount of damage, as opposed to only the

determination of liability, depends upon a judicial determination based upon conflicting evidence and is not ascertainable from truthful data supplied by the claimant to his debtor." Esgro Central, Inc. v. General Ins. Co., 98 Cal. Rptr. 153, 158 (Cal. Ct. App. 1971). Where the parties have not contracted for a particular rate of interest, interest is to accrue at a rate of 10% per annum after breach. Cal. Civ. Code § 3289.

"It is settled that even in diversity cases post-judgment interest is determined by federal law." Northrop, 842 F.2d at 1155. Post-judgment interest must be awarded on any money judgment entered in a civil case in the district court. 28 U.S.C. § 1961. It is to be calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment." Id. Post-judgment interest is compounded annually and computed daily up to the date the judgment is paid. Id. § 1961(b). Post-judgment interest is to be applied to all component parts of a judgment, including costs and the prejudgment interest award. Air Separation, Inc. v. Underwriters at Lloyd's of London, 45 F.3d 288, 290-91 (9th Cir. 1995).

**B. Analysis**

    1. Motion for Reconsideration

        Plaintiffs argue that they are entitled to either

amendment or relief from the Judgment because the Court manifestly erred by concluding that: (1) the 2017 Agreement failed to satisfy the statute of frauds; (2) the economic loss rule barred Plaintiffs' fraud claims; (3) Defendants did not owe Plaintiffs a duty to disclose their intent to end supply; and (4) AquaChile was entitled to recovery as a matter of law on its counterclaims for breach of contract.  Pls.' Mot. for Reconsideration 1:13-26, ECF No. 272.  The Court will address each argument in turn.

          a.   The Statute of Frauds [272]

"A memorandum satisfies the statute of frauds if it identifies the subject of the parties' agreement, shows that they made a contract, and states the essential contract terms with reasonable certainty."  Sterling v. Taylor, 152 P.3d 757, 766 (Cal. 2007).  "What is essential depends on the agreement and its context and also on the subsequent conduct of the parties."  Id. "Because the memorandum itself must include the essential contractual terms, it is clear that extrinsic evidence cannot *supply* those required terms."  Id. at 767.

Plaintiffs argue that the Court failed to consider Plaintiffs' argument that "the combination of the [2017 Agreement] and the [2019 Agreement] together constituted a sufficient 'memorandum' or 'writing' to satisfy the statute of frauds."  Mot. 3:17-19.  This argument fails under Sterling, which makes clear that the essential

terms of the agreement sought to be enforced must be stated in the memorandum itself. Here, the 2019 Agreement contains *no* essential terms from the 2017 Agreement at all. It is thus impossible for the Court to determine with any certainty that the 2019 Agreement is referencing the purported 2017 Agreement that Plaintiffs have put forward. Plaintiffs insist that the essential terms of the 2017 Agreement can be read into the 2019 Agreement, but the two documents cannot be read together to satisfy the statute of frauds when the 2019 Agreement contains no essential terms from the 2017 Agreement whatsoever. See Straus v. De Young, 155 F. Supp. 215, 219 (S.D. Cal. 1957) (finding signed memorandums insufficient to satisfy the statute of frauds because none contained "any language which indicate[d] or from which might be inferred an intention on the part of the defendants to authenticate or confirm the oral agreement").

In the cases cited by Plaintiff where the Court read two documents together, it was clear that the signed writing was referring to another specific document that set forth the essential terms of the agreement. See, e.g., Searles v. Gonzales, 191 Cal. 426, 433 (1923) (considering unsigned interest notices together with signed checks because the documents "were, without question, linked together in the minds of the parties"). Here, however, the relation between the 2019 Agreement and the purported 2017 Agreement simply does

not "appear upon the face of the writings relied upon." Id. at 431. The 2019 Agreement's single reference to an agreement between the parties that took place in 2017 does not satisfy the statute of frauds. As stated in the Court's previous order, the 2019 Agreement could be referring to a single purchase order entered into on July 3, 2017, just as easily as it could be referring to a three-year supply agreement entered into on that date.

Plaintiffs further assert that the Court failed to recognize that the 2019 Agreement "affirmed the three-year duration when considered with parol evidence, which can be introduced to establish satisfaction of the statute of frauds." Mot. for Reconsideration 8:3-7. Not so. The law is clear that extrinsic evidence cannot be used to supply essential terms that are missing from the memorandum. See Sterling, 40 Cal. 4th at 766. Moreover, as the Court stated in its previous Order, the extrinsic evidence in this case does not convince the Court that the parties entered into a three-year supply agreement. Outside of the purported agreement itself, Plaintiffs have failed to identify in the record a single reference to a commitment by Defendants to continue supplying Plaintiffs with salmon through July 2020. "The primary purpose of the [statute of frauds] is evidentiary," and Plaintiffs have not provided sufficient evidence that the three-year supply agreement was actually entered into. See id. It therefore fails under the statute of frauds and is unenforceable as a

matter of law.

### b. Fraudulent Concealment

Plaintiffs argue that the Court erred in dismissing their fraudulent inducement theory for two reasons: (1) their fraud theory has been consistent throughout this case, and (2) the economic loss doctrine does not apply to fraudulent inducement claims. See Mot. for Reconsideration 9:23-12:1.

As to the consistency of their fraud theory, Plaintiffs assert that their fraudulent concealment claims have always been based on Defendants' intentional concealment of the impending supply cutoff in order to induce Smokehouse to enter into the 2019 Agreement and other subsequent purchases. Id. at 10:21-11:21. However, Plaintiffs did not frame their claims as fraudulent inducement in the FAC. Plaintiffs did not allege that Defendants fraudulently concealed the supply cutoff with the intention of inducing Plaintiffs to enter into subsequent agreements. Rather, Plaintiffs alleged that Defendants concealed the supply cutoff to avoid litigation, and as a result, Plaintiffs were deprived of time to find alternative suppliers. See FAC ¶¶ 76, 80, 100-109. Plaintiffs should not be permitted to change the factual basis of their claim at the summary judgment stage. See Swan v. Bank of Am. Corp., No. 2:07-CV-00217-PMP-LRL, 2008 WL 2859066, at *10-11 (D. Nev. July 22, 2008) (citing Coleman v. Quaker Oats Co., 232 F.3d 1271, 1294 (9th Cir. 2000)).

Even if the Court were to consider Plaintiffs' fraudulent inducement theory, the claims would still be barred by the economic loss rule. The economic loss rule bars tort claims that seek recovery for purely economic loss that is indistinguishable from the loss caused by the breach of a contract. Robinson Helicopter Co., v. Dana Corp., 102 P.3d 268, 273 (Cal. 2004). Thus, "[g]enerally speaking, the terms of a contract cannot form the basis of a fraudulent inducement claim." Lee v. Fed. St. L.A., LLC, No. 2:14-cv-06264-CAS(SSx), 2016 WL 2354835, at *9 (C.D. Cal. May 3, 2016) (citing Foster Poultry Farms v. Alkar-Rapidpak-MP Equipment, Inc., 868 F. Supp. 2d 983, 993 (E.D. Cal. 2012)).

Here, the purportedly fraudulent promise that induced Plaintiffs to enter into the 2019 Agreement and other subsequent purchases was that AquaChile would continue supplying Plaintiffs with salmon. This was an express term of the purported 2017 Agreement. Thus, however Plaintiffs frame their fraud claims, they cannot escape the economic loss rule because the claims are based on Defendants' failure to abide by their obligation under the 2017 Agreement to continue supplying Smokehouse with salmon. Even if Defendants' promise of continued supply induced Plaintiffs to enter into a new contract with new parties, the breached obligation that Plaintiffs seek to hold Defendants liable for arises from the 2017 Agreement. Moreover, Plaintiffs seek identical damages for their contract

1  claims as they do for their fraud claims.  The fraud
2  claims are therefore barred.  See Foster Poultry Farms,
3  868 F. Supp. 2d at 994 (holding that "regardless of the
4  language used" in labelling a claim, fraud claims
5  involving misrepresentations that also constitute
6  standalone contractual obligations are barred by the
7  economic loss rule).

        c.   Duty to Disclose

9     Even if Defendants' purported misrepresentations
10 were independent of the contractual obligations created
11 by the 2017 Agreement, Plaintiffs' fraud claims
12 alternatively fail because Defendants did not have a
13 duty to disclose the supply cutoff decision to
14 Plaintiffs.  Nothing in Plaintiffs' Motion convinces the
15 Court that this holding was erroneous.  Plaintiffs rely
16 upon the same law and the same facts in the record as it
17 did previously in arguing that a duty existed, all of
18 which the Court considered before ruling on Defendants'
19 Motion for Summary Judgment.  The Court need not address
20 those arguments again here.  See C.D. Cal. L.R. 7-18
21 ("No motion for reconsideration may in any manner repeat
22 any oral or written argument made in support of, or in
23 opposition to, the original motion."); Costello, 765 F.
24 Supp. at 1009.

        d.   AquaChile's Counterclaims

26    Plaintiffs similarly fail to identify manifest
27 error in the Court's ruling on AquaChile's counterclaims
28 for breach of contract.  Plaintiffs state that they

provided various evidence of AquaChile's representations to Smokehouse that certain fillets were washed. However, Plaintiffs provide no evidence of a representation made by AquaChile that was knowingly false when made. To prevail on its affirmative defense, Smokehouse needed to identify a triable issue of fact that AquaChile made a promise that it "had no intention of performing at the time the promise was made." UMG Recordings, Inc. v. Global Eagle Ent., Inc., 117 F. Supp. 3d 1092, 1108 (C.D. Cal. 2015). Plaintiffs assert that AquaChile ceased washing their salmon fillets in July 2019, see Pls.' Resp. to Defs.' SUF ¶ 240, but they provide no evidence that any of the relevant purchases were placed after this date. In other words, there is no evidence that AquaChile promised to provide washed fish with the intention of breaching that promise. Even if some of the orders were ultimately not washed in accordance with Smokehouse's expectations, "[m]ere nonperformance of a promise does not suffice to show falsity of a promise." UMG Recordings, 117 F. Supp. 3d at 1108; see also Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n, 55 Cal. 4th 1169, 1183 (2013) ("It is insufficient to show an unkept but honest promise, or mere subsequent failure of performance."). Thus, the Court did not err in granting AquaChile summary judgment on its breach of contract claims.

In sum, Plaintiffs have failed to meet the high bar required for relief under either Rule 59(e) or Rule

60(b). The Court declines to address any remaining arguments made by Plaintiffs, as they are repetitive of those made in their Opposition to Defendants' Motion for Summary Judgment and therefore procedurally improper. As other courts have aptly stated:

> Rarely does the losing party believe that its position lacked merit, or that the Court was correct in ruling against it. Rather than either accept the Court's ruling or appeal it, it seems to have instead become *de rigueur* to file a motion for reconsideration. The vast majority of these motions represent a simple rehash of the arguments already made, although now rewritten as though the Court was the opposing party and its Order the brief to be opposed. It is easy for each litigant to consider only his or her own motion, and the seemingly manifest injustice that has been done to them. But the cumulative effect is one of abuse of the system and a drain on judicial resources that could be better used to address matters that have not yet been before the Court once, let alone twice.

See Evans Hotel, 2022 WL 272009, at *5 (quoting Holtz v. Powazek, No. 3:21-cv-01401-CAB-JLB, 2021 WL 5448981, at *2 (S.D. Cal. Nov. 22, 2021)). Plaintiff's Motion is **DENIED**.

    2.  Motion to Amend [273]

AquaChile moves for amendment of the Court's judgment to include an award of both prejudgment and post-judgment interest in relation to its breach of contract claims. See generally AquaChile's Mot. to Am. J., ECF No. 273. The Court concludes that AquaChile is

entitled to both prejudgment and post-judgment interest and accordingly **GRANT** AquaChile's Motion.

### a. Prejudgment Interest

Plaintiffs argue that AquaChile is not entitled to prejudgment interest because Smokehouse's alleged debt under each of the purchase orders was a disputed fact. Pls.' Opp'n to Mot. to Am. J. 2:14-15, ECF No. 277. They argue that the parties "did not have a meeting of the minds about the value of the product that AquaChile delivered" because Smokehouse believed it was receiving washed salmon fillets, but the fillets were in fact non-washed. Id. at 2:26-3:8. Thus, the fair value of the non-washed fillets received by Smokehouse was less than the stated purchase price and remains a disputed fact. Id. at 3:25-4:1.

Plaintiffs' argument fails because Plaintiffs did not dispute the amount that AquaChile was entitled to recover on its breach of contract claims at the summary judgment stage. In opposing these counterclaims, Plaintiffs argued that AquaChile was not entitled to recovery at all because AquaChile misrepresented that the fillets were washed, a material component of the agreement. See Pls.' Opp'n to MSJ 25:10-22. Plaintiffs did not argue, however, that if AquaChile was entitled to recovery, the amount of damages was actually less than what AquaChile claimed. "A claim that damages is $0 is not a dispute which renders the amount of damages uncertain; it is effectively an argument for no

liability." L.A. Unified Sch. Dist. v. Torres Constr. Grp., 271 Cal. Rptr. 3d 523, 548 (Cal. Ct. App. 2020). AquaChile requested a certain amount of damages for its counterclaims, and Plaintiffs did not dispute that this was the proper amount reflected in the purchase orders or that the purchase orders governed AquaChile's claim for damages. Plaintiffs therefore knew the amount of damages owed to AquaChile if Smokehouse were to be found liable on the breach of contract claims. See Chesapeake Indus., Inc. v. Togova Enters., Inc., 197 Cal. Rptr. 348, 352 (Cal. Ct. App. 1983) (stating that the focus in determining whether damages are sufficiently certain is on the debtor's knowledge about the amount of the creditor's claim). AquaChile's damages were thus certain, and AquaChile is entitled to prejudgment interest.

The parties agree on the proper calculation method for prejudgment interest and further agree that the proper amount of prejudgment interest to be awarded is $131,850.21. See Pls.' Opp'n to Mot. to Am. J. 5:12-15; AquaChile's Reply in Supp. of Mot. to Am. J. 6:7-12, ECF No. 282. The Court therefore **GRANTS** Defendant's request for prejudgment in the amount of $131,850.21.

   b. Post-Judgment Interest

Plaintiffs do not dispute that an award of post-judgment interest is mandatory under 28 U.S.C. § 1961 or that the applicable interest rate is 1.02%. See Pls.' Opp'n to Mot. to Am. J. 5:24-26. The parties further

agree that the post-judgment interest calculation should include the final costs amount awarded on Defendants' Application to the Clerk to Tax Costs. Thus, the Court **GRANTS** AquaChile's request for post-judgment interest, which is to be computed daily starting from March 7, 2022. The amount accrued per day shall be calculated by adding together $688,369.53 and the total costs awarded, multiplying that amount by the interest rate of 1.02%, and dividing by 365 to arrive at the daily figure.

### III. CONCLUSION

Based on the foregoing, the Court **DENIES** Plaintiffs' Motion for Reconsideration. The Court **GRANTS** AquaChile's Motion to Amend Judgment to add prejudgment and post-judgment interest. The prejudgment interest award is **$131,850.21.** The post-judgment interest award is to accrue at the statutory rate starting from March 7, 2022. Defendants shall file a Proposed Amended Judgment reflecting interest awards consistent with both this Order and the final cost award.

**IT IS SO ORDERED.**

DATED: June 14, 2022  /s/ Ronald S.W. Lew
**HONORABLE RONALD S.W. LEW**
Senior U.S. District Judge